[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 540.]

THE STATE EX REL. CINCINNATI POST *v*. CITY OF CINCINNATI.

[Cite as *State ex rel. Cincinnati Post v. Cincinnati*, 1996-Ohio-372.]

*Municipal corporations—City council meetings—Ohio Sunshine Law cannot be circumvented by scheduling back-to-back meetings which, taken together, are attended by a majority of a public body.*

The Ohio Sunshine Law cannot be circumvented by scheduling back-to-back meetings which, taken together, are attended by a majority of a public body.

(No. 95-1803—Submitted June 5, 1996—Decided September 4,1996.)

IN MANDAMUS.

_____

{¶ 1} In June 1995, the city of Cincinnati was given a figurative "two-minute warning" by the owner of the Cincinnati Bengals—if the city and Hamilton County did not agree by the end of June to build a new stadium for the team, the Bengals would move to Baltimore. The Cincinnati Reds' ownership was also putting the "squeeze play" on the city—the Reds wanted a stadium separate from the Bengals and were reportedly looking at sites in Kentucky. Neither team was satisfied with the county-owned Riverfront Stadium.

{¶ 2} The city believed that the key to retaining both teams was to provide them with new facilities, and the city sought to enter into an agreement with the county to achieve that goal, prior to the expiration of the Bengals' deadline. Cincinnati's City Manager, John F. Shirey, met with the administrator for the county to discuss a proposal by the Hamilton County Commissioners for reaching an agreement. Any agreement would have to be approved by both city council and the county commissioners.

{¶ 3} The meeting gave Shirey a general idea of what the county would require in an agreement. Shirey decided to huddle with council members regarding

the county's proposal. As city manager, Shirey is the chief executive and administrative officer of the city. While he has a seat on council, he cannot vote. The city manager can propose legislative business for council to consider.

{¶ 4} Regular council meetings are held every Wednesday at 2 p.m. in council chambers at City Hall. Council can convene special meetings upon the request of any two council members with twelve hours' notice to the other council members, and with an advertisement in a newspaper of general circulation in the city. In the past, council has convened special sessions at the request of the city manager.

{¶ 5} Council's regular and special meetings are open to the public, except during executive sessions, which council periodically convenes during regular or special sessions. Executive session is held in a different room. The city manager often convenes executive sessions by asking two members of the council to move for an executive session. Executive sessions are not tape-recorded or broadcast, unlike regular and special sessions.

{¶ 6} Such was the system for council meetings when Shirey called his first series of nonpublic, back-to-back sessions with council members on the morning of June 21, 1995. In all, three sets of back-to-back meetings were held between the city manager and council members. The same procedure applied to each set. The city manager's administrative assistant scheduled the meetings so that at no session would there be a majority of council members. In depositions the city manager testified that "the reason for having fewer than a majority of members of council at a meeting is so that we wouldn't violate Ohio['s] Open Meetings Law." Shirey testified that he understood that if a majority of council met to discuss possible business, and the public was excluded, the meeting would violate Ohio's "Sunshine Law." All of the meetings were held in the city manager's office, and the county's proposal for building new stadiums was discussed at all the sessions.

{¶ 7} A total of six council members attended the June 21, 1995 sessions. Together, the sessions lasted three hours. Even though council did not follow its procedure for convening executive sessions, the meetings were closed to the public. The county's proposal was not discussed at council's regular, public meeting that afternoon.

{¶ 8} The county publicly announced the specific terms of its proposal the next day, June 22, 1995. On Friday, June 23, Shirey had another series of back-to-back sessions with council members. On Monday, June 26, the final sessions were held. All were closed to the public and none followed council's procedure for convening executive sessions. At least five of the nine council members attended Friday's and Monday's meetings.

{¶ 9} The city manager met again with the county administrator on June 27 to discuss the county's proposal. On Thursday, June 29, council held a special session open to the public at which it approved by a five-to-four vote the specific terms of a memorandum of understanding between the city and county. The memorandum of understanding contained key differences from the county's original proposal.

{¶ 10} In the closed-door meetings, council members expressed opinions about the county's proposal, criticized parts of it, and expressed approval over parts of it, but no votes were taken. Before the first series of meetings, one council member asked to attend the first session, but was told he could not unless one of the already confirmed attendees did not appear or agreed to attend a later session. Another member of council showed up for a session for which he had not been confirmed, causing a majority of council to be present, and was asked to attend another session instead.

{¶ 11} The city did not notify the public of any of the back-to-back sessions or otherwise allow the public to attend. News reporters waiting outside were not allowed in.

**{¶ 12}** After being excluded from the back-to-back sessions and after council approved the agreement with the county, the Cincinnati Post asked the city to prepare and make available minutes describing what had been discussed at the sessions. The city refused, without acknowledging that the back-to-back sessions had actually occurred. The Post brought this action to compel the city to prepare and make available to the public minutes summarizing the discussions at the back-to-back sessions.

_____

*Baker & Hostetler*, *David L. Marburger, Hilary W. Rule, Jeffrey T. Williams* and *Bruce W. Sanford*, for relator.

*Fay D. Dupuis*, City Solicitor, and *Karl P. Kadon III*, Deputy City Solicitor, for respondent.

_____

**PFEIFER, J.**

**{¶ 13}** We hold that the Cincinnati City Council's back-to-back meetings, which, taken together, were attended by a majority of council members, violated the provisions of R.C. 121.22, that the dictates of R.C. 121.22 are applicable to Cincinnati City Council, and that the Cincinnati Post is entitled to its requested relief.

**{¶ 14}** Ohio's "Sunshine Law," R.C. 121.22, requires that public officials, when meeting to consider official business, conduct those meetings in public. The statute reads:

"(A) This section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings, unless the subject matter is specifically excepted by law."

**{¶ 15}** The statute also requires public bodies to keep minutes of their meetings. R.C. 121.22(C) provides:

"All meetings of any public body are declared to be public meetings open to the public at all times. * * *

"The minutes of a regular or special meeting of any such public body shall be promptly prepared, filed, and maintained and shall be open to public inspection."

{¶ 16} In *State ex rel. Fairfield Leader v. Ricketts* (1990), 56 Ohio St.3d 97, 564 N.E.2d 486, this court applied the Sunshine Law to supposedly "informal" meetings where discussions of public interest were held. In *Fairfield Leader*, the Fairfield County Commissioners met at a hotel on a Saturday morning for a "workshop" or "retreat" with a majority of the trustees of Violet Township and a majority of the members of the council of the village of Pickerington. Topics for the meeting included water and sewer service, traffic patterns, and land use planning.

{¶ 17} Construing an earlier, similar version of R.C. 121.22(C), this court issued a writ of mandamus compelling the commissioners and the trustees separately to prepare minutes describing their discussions. This court held:

"[W]here, as here, the members of a public body agree to attend, in their official capacity, a meeting where public business is to be discussed and a majority of the members do attend, R.C. 121.22(C) necessitates that minutes of the meeting be recorded." 56 Ohio St.3d at 102, 564 N.E.2d at 491.

{¶ 18} In this case, members of council agreed to attend a scheduled meeting to discuss public business. However, unlike in *Fairfield Leader*, a majority of council members were not present at any one session. R.C. 121.22(B)(2) defines a "meeting" as "any prearranged discussion of the public business of the public body by a majority of its members."

{¶ 19} The question becomes whether a public body may circumvent the requirements of the statute by setting up back-to-back-meetings of less than a majority of its members, with the same topics of public business discussed at each. We hold that the statute prevents such maneuvering to avoid its clear intent.

**{¶ 20}** First, we note that the statute states that it "shall be liberally construed." R.C. 121.22(A). A liberal construction of the definition of "meeting" would include the back-to-back sessions held by council in this case. The elements of the statutory definition of a meeting are (1) a prearranged discussion, (2) a discussion of the public business of the public body, and (3) the presence at the discussion of a majority of the members of the public body. The council meetings certainly fit within the first two elements. As to the third element, back-to-back sessions discussing exactly the same public issues can be liberally construed as two parts of the same meeting. A majority of council members thus did attend the "meeting."

**{¶ 21}** Also, when construing a statute, this court's "paramount concern" is the statute's legislative intent. *State v. S.R.* (1992), 63 Ohio St.3d 590, 594, 589 N.E.2d 1319, 1323. This court avoids adopting a construction of a statute that would "result in circumventing the evident purpose of the enactment." *Daiquiri Club, Inc. v. Peck* (1953), 159 Ohio St. 52, 55, 50 O.O. 26, 28, 110 N.E.2d 705, 707. We must also construe statutes to avoid unreasonable or absurd results. See R.C. 1.47(C); *State ex rel. Brown v. Milton-Union Exempted Village Bd. of Edn.* (1988), 40 Ohio St.3d 21, 27, 531 N.E.2d 1297, 1303.

**{¶ 22}** To find that Cincinnati's game of "legislative musical chairs" is allowable under the Sunshine Law would be to ignore the legislative intent of the statute, disregard its evident purpose, and allow an absurd result.

**{¶ 23}** The statute requires that governmental bodies "conduct all deliberations upon official business only in open meetings." R.C. 121.22(A). Its very purpose is to prevent just the sort of activity that went on in this case—elected officials meeting secretly to deliberate on public issues without accountability to the public.

**{¶ 24}** R.C. 121.22(G) does recognize that certain sensitive information is best discussed privately among members of a public body. Thus, the statute allows

for "executive sessions" of a public body, where the public may be barred. Subsection (G) requires that certain procedures be followed before an executive session may be called, conditions which were not met in this case. The statute does not prohibit impromptu hallway meetings between council members—the statute concerns itself with prearranged discussions. It does not prohibit member-to-member prearranged discussions. The statute concerns itself only with situations where a majority meets. Although a majority of council members were not in the same room at the same time, a majority of them did attend a prearranged meeting to deliberate on issues of great interest to the public.

{¶ 25} To rule in Cincinnati's favor would be to endorse the behavior undertaken by city council and the city manager in this case and make it applicable to every city council meeting in Ohio. The statute that exists to shed light on deliberations of public bodies cannot be interpreted in a manner which would result in the public being left in the dark. The Ohio Sunshine Law cannot be circumvented by scheduling back-to-back meetings which, taken together, are attended by a majority of a public body.

{¶ 26} One of two remaining questions is whether the Sunshine Law applies to Cincinnati City Council. The city's charter provides:

"The laws of the state of Ohio not inconsistent with this charter, except those declared inoperative by ordinance of the council, shall have the force and effect of ordinances of the city of Cincinnati; but in the event of conflict between any such law and any municipal ordinance or resolution the provisions of the ordinance or resolution shall prevail and control." Section 1, Article II, Cincinnati City Charter.

{¶ 27} The city's charter addresses the openness of council sessions by stating that "[t]he proceedings of the council shall be public." Section 5, Article II, Cincinnati City Charter. That is certainly not inconsistent with the Sunshine Law, and the Law therefore applies to Cincinnati City Council.

**{¶ 28}** The only remaining question, then, is whether the Post's requested relief is appropriate. It is. This court has previously held in *Fairfield Leader* that mandamus is the appropriate remedy to compel the preparation of minutes of the meetings of a public body. 56 Ohio St.3d at 102-103, 564 N.E.2d at 491-492.

**{¶ 29}** We therefore grant the requested writ and order the city of Cincinnati to prepare and make available to the public minutes of the series of back-to-back meetings held by members of city council between June 21 and June 26, 1995.

*Writ allowed.*

MOYER, C.J., COOK and STRATTON, JJ., concur.

MOYER, C.J., concurs separately.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur in part and dissent in part.

_____

**MOYER, C.J., concurring.**

**{¶ 30}** I concur in the grant of the requested writ. The majority does not, however, address relator's prayer for attorney fees asserted pursuant to R.C. 149.43(C). The majority's decision not to address the question will result in the denial of relator's request for an award of attorney fees. I believe this to be the correct decision and write to briefly explain my position on the issue.

**{¶ 31}** Paragraph two of the syllabus of *State ex rel. Fox v. Cuyahoga Cty. Hosp. Sys.* (1988), 39 Ohio St.3d 108, 529 N.E.2d 443, states, "The award of attorney fees under R.C. 149.43(C) is not mandatory." The purpose of the attorney fee provision is to discourage state officials, agencies and their legal counsel from engaging in conscious circumvention of statutory mandates. In *Fox,* we held that relators "must demonstrate a sufficient benefit to the public to warrant the award of attorney fees. The court may also consider the reasonableness of respondents' refusal to comply, since attorney fees are regarded as punitive. Respondents argue that they acted in good faith and presented serious legal issues regarding

[respondents' obligation to maintain open records]. We find no evidence of bad faith on the part of respondents. There was a reasonable legal basis for respondents' refusal to produce the requested documents and relators' prayer for attorney fees is therefore denied*." Id.* at 112, 529 N.E.2d at 447.

{¶ 32} The award of attorney fees to relator in this case would be the equivalent of a sanction against council and its legal advisors for actions which amount to conscious misdeeds. I am not convinced that the meetings at issue constitute the kind of conscious circumvention of the law that calls not only for correction, but for sanction as well. A reasonable (though ultimately unpersuasive) argument could be made for the legality of the actions of council in this case. The facts were unique and not previously reviewed by this court in other cases.

{¶ 33} Under such circumstances it would be unreasonable to impose upon the Cincinnati City Council and its attorneys a sanction for the violation of laws which were not so clearly broken that a reasonable argument could not be made for the legality of the procedure. Moreover, the imposition of a sanction in this case would not serve the deterrent purpose of the statutory attorney fee provision of the Ohio Sunshine law.

{¶ 34} Because I would not grant an award of attorney fees under R.C. 149.43(C) where there is a reasonable legal basis for respondents' actions and where such conduct has not previously been considered by this court, I concur in the denial of relator's request for attorney fees.

_____

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 35} The majority grants the requested writ and I concur. The majority does not, however, discuss the allowance of attorney fees as prayed for by relator in its complaint and supported in its reply brief at Proposition of Law No. Five. I would grant the relator its costs and attorney fees.

**{¶ 36}** It is nigh impossible to distinguish this case from our holding in *State ex rel. Fairfield Leader v. Ricketts* (1990), 56 Ohio St.3d 97, 564 N.E.2d 486. In that case, under very similar circumstances (but, arguably, less egregious), we allowed an award of over $36,000 in costs and attorney fees to a newspaper which sued, successfully, to require a municipal council to prepare minutes of a previously held closed session. See (1992), 63 Ohio St.3d 1414, 586 N.E.2d 122. The result here should be no different especially given that, I believe, attorney fees are mandatory pursuant to R.C. 149.43(C). Further, it is arguable that by logical extension, R.C. 121.22(I)(2)(a) might apply.

**{¶ 37}** In any event, the majority does not award fees and I must respectfully, but vigorously, dissent from that part of the majority's judgment. I concur in the balance of the opinion and the judgment.

RESNICK and F.E. SWEENEY, JJ., concur in the foregoing opinion.

_____