[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 58.]

TBC WESTLAKE, INC., APPELLEE, *v.* HAMILTON COUNTY BOARD OF REVISION;

RHODES, HAMILTON COUNTY AUDITOR, ET AL., APPELLANTS.

[Cite as *TBC Westlake, Inc. v. Hamilton Cty. Bd. of Revision*, 1998-Ohio-445.]

*Taxation—Real property—Valuation of two adjacent office buildings by Board of Tax Appeals—Board of Tax Appeals' attorney-examiner's report is not a public record — Judicial mental process privilege—Weighing evidence and granting credibility to witnesses is BTA's statutory job—BTA's determination of basic factual matters affirmed by Supreme Court if supported by sufficient, probative evidence of record.*

(No. 97-646—Submitted September 30, 1997—Decided February 11, 1998.)

APPEAL from the Board of Tax Appeals, Nos. 95-K-1358 and 96-K-167.

———————————

{¶ 1} TBC Westlake, Inc., appellee, filed a complaint with the Hamilton County Board of Revision ("BOR") seeking to reduce the true value of its real property, two adjacent office buildings known as Westlake Center and Lake Forest Place, for the tax year 1993. Appellant Sycamore Community School District Board of Education ("Sycamore") filed a counter-complaint seeking to retain the value determined by appellant Dusty Rhodes, Hamilton County Auditor. After receiving testimony and evidence from both complainants, the BOR determined the true value to be $41,000,000, a decrease from the auditor's valuation of $46,388,200. Nevertheless, Westlake appealed the BOR's decision to the Board of Tax Appeals ("BTA").

{¶ 2} At the BTA, Westlake presented the testimony and report of Don T. Carrelli, a real estate appraisal expert. He described the property as 26.326 acres containing two glass and steel office buildings totaling 422,361 square feet. Westlake Center, the older building constructed in 1981 and updated in 1993,

contains 191,231 square feet on six floors. Carrelli described Westlake Center to be inferior in design and materials to Lake Forest Place and termed it a lower-than-average, class-A structure.

{¶ 3} Carrelli described Lake Forest Place as a four- and seven-story structure containing a gross area of 231,126 square feet. It opened in 1985 and had been partially updated by 1993. It contains a four-story atrium and, according to Carrelli, is a good-construction, class-A office building.

{¶ 4} The property also includes a separate bank building with drive-through bays. The bank was built in 1986 of concrete block with face-brick and glass-block exterior walls.

{¶ 5} Carrelli employed the three standard approaches to value: the cost, sales-comparison, and income approaches, placing major emphasis on the income approach. The cost approach yielded a value of $35,100,000 and the sales-comparison approach, a value of $34,600,000. Carrelli dismissed these two approaches as weak and less supportable than the income approach.

{¶ 6} In the income approach, Carrelli judged the property's most current rents to be the property's market rentals and multiplied the rents by the leasable square footage. Westlake Center's rental rate was $13 per square foot, and Lake Forest Place's rental rates were $14 per square foot. To the potential gross income of $5,379,746, he applied a fifteen percent vacancy rate. According to Carrelli, the actual vacancy rate for 1993 for Lake Forest Place was fifteen percent, and, according to a commercial real estate firm, the average class-A vacancy rate for the community in 1992 was fifteen to seventeen percent. This calculation produced an effective gross income of $4,572,784. Carrelli deducted what he considered to be market expenses of $915,341 to arrive at net income of $3,657,443. He obtained the capitalization rate of 10.5 percent from a study of suburban office properties prepared by another commercial real estate firm. Dividing the net income by the

capitalization rate, he determined the value of the property, via the income approach, to be $34,800,000.

{¶ 7} In his correlation, Carrelli presented the income approach as the better-supported approach and concluded that the true value of the subject property was $34,800,000 as of January 1, 1993.

{¶ 8} Rhodes and Sycamore did not present any valuation testimony to the BTA. Rhodes had presented the testimony and the "Summary Appraisal Report" of Thomas O. Willingham and Bradley W. Plummer, real estate appraisers, to the BOR. The BTA reviewed this report but rejected it. According to the BTA, Willingham and Plummer did not record the information they relied on to appraise the property. Moreover, neither individual testified before the BTA; thus, the BTA could not question them about their report. Finally, the BTA expressed concern about a $3,000,000 modification the two appraisers incorporated into the value estimate after they wrote the report.

{¶ 9} In deciding this case, the BTA reviewed Carrelli's presentation, rejected appellants' criticism of his report, and found that it satisfied Westlake's burden of proof. The BTA, based on a preponderance of the evidence, found the true value of the property to be $34,800,000, as concluded by Carrelli.

{¶ 10} In the course of the proceedings, the BTA refused auditor Rhodes's request that it distribute to the parties the attorney-examiner's report prepared for the BTA. According to the BTA, its practice is to receive for approval a proposed opinion drafted by the attorney-examiner assigned to hear and recommend a resolution of the case. The BTA ruled that R.C. 5717.01 does not require it to release these draft opinions to the parties. It, further, found that it is not an "agency" expressly governed by R.C. Chapter 119, the Administrative Procedure Act, which requires an administrative agency to serve examiner recommendations on the parties to an adjudication. R.C. 119.09.

{¶ 11} This cause is now before this court upon an appeal as a matter of right.

_____

*Wayne E. Petkovic*, for appellee.

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Thomas J. Scheve*, Assistant Prosecuting Attorney, for appellant Hamilton County Auditor.

*Klaine, Wiley, Hoffman & Minutolo* and *Franklin A. Klaine, Jr.,* for appellant Sycamore Community School District Board of Education.

_____

***Per Curiam***.

{¶ 12} We reverse the portion of the BTA's decision that did not value the separate bank building and remand the case for it to value such building. We affirm the remainder of the BTA's decision.

{¶ 13} In proposition of law No. 1, appellants contend that the BTA should have distributed the attorney-examiner's report to the parties. They essentially claim that Ohio's open meeting and public records laws require this.

{¶ 14} R.C. 5717.01 authorizes the BTA to hear appeals of valuation complaints, "[to] cause its examiners to conduct such hearing and to report to it their findings for affirmation or rejection."

{¶ 15} Appellants do not claim that R.C. 119.09 requires the BTA to serve its examiners' reports on the appellants. Indeed, R.C. 119.01, in defining "agency," does not identify the BTA as one of the agencies specifically subject to this chapter. Appellants, however, contend that R.C. 121.22, the Sunshine Law, and R.C. 149.43, the Public Records Law, apply. We conclude, to the contrary, that the Sunshine Law does not apply to adjudication proceedings at the BTA and that the attorney-examiner report is exempt from the Public Records Law under the "judicial mental process" privilege.

4

{¶ 16} "Ohio's 'Sunshine Law,' R.C. 121.22, requires that public officials, when meeting to consider official business, conduct those meetings in public." *State ex rel. Cincinnati Post v. Cincinnati* (1996), 76 Ohio St.3d 540, 542, 668 N.E.2d 903, 905. R.C. 121.22(C) provides:

"All meetings of any public body are declared to be public meetings open to the public at all times. * * *

"The minutes of a regular or special meeting of any public body shall be promptly prepared, filed, and maintained and shall be open to public inspection. * * *"

{¶ 17} In *Westerville v. Hahn* (1988), 52 Ohio App.3d 8, 556 N.E.2d 200, the Franklin County Board of Commissioners, in an annexation proceeding, had consulted privately with its staff attorney on the validity of petition signatures. The Court of Appeals for Franklin County rejected the contention that this meeting violated the Sunshine Law and refused to invalidate the board's order approving the annexation. Judge McCormac, writing for the unanimous court, noted that this court, in *Matheny v. Frontier Local Bd. of Edn.* (1980), 62 Ohio St.2d 362, 16 O.O.3d 411, 405 N.E.2d 1041, had held that the term "meeting" in the Sunshine Law had a different meaning than "hearing" in a former version of the law. According to the *Westerville* court, "[t]he term 'hearing' was used to refer to situations where a formal hearing was statutorily mandated. Therefore, even though a public body must open all its meetings to the public, there is a category of gatherings, called 'hearings,' which do not have to be public." *Westerville* at 12, 556 N.E.2d at 205.

{¶ 18} The *Westerville* court concluded that the annexation proceeding in that case was a quasi-judicial proceeding because the board needed to provide notice, hearing, and an opportunity to introduce evidence. The court further concluded that the hearing fell "into the category of gatherings which are not meetings and, hence, [do] not fall under the Sunshine Law. The fact that the board

was deciding a dispute between two outside groups adds force to the conclusion that the proceeding was quasi-judicial." *Id.*

{¶ 19} In *Zangerle v. Evatt* (1942), 139 Ohio St. 563, 571, 23 O.O. 52, 55, 41 N.E.2d 369, 373, we held that the BTA is a quasi-judicial body when discharging its adjudication duties. In this task, the BTA conducts hearings in the nature of legal proceedings, providing notice and an opportunity to introduce testimony through witnesses. A litigant may appeal to the courts only those administrative agency decisions resulting from quasi-judicial proceedings. *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 51 O.O.2d 35, 257 N.E.2d 371; *M.J. Kelly Co. v. Cleveland* (1972), 32 Ohio St.2d 150, 61 O.O.2d 394, 290 N.E.2d 562. In *Rossford Exempted Village School Dist. v. State Bd. of Edn.* (1989), 45 Ohio St.3d 356, 359, 544 N.E.2d 651, 654, we stated:

"Permitting appeal from a quasi-judicial proceeding is based on the premise that an adjudication has been made by the agency which determines the rights or duties of parties with conflicting interests — in other words, there is a justiciable dispute requiring evaluation and resolution. Implicit in this concept is the exercise of discretion. In *Englewood v. Daily* (1965), 158 Colo. 356, 361, 407 P.2d 325, 327, the court stated that in deciding whether an act by an administrative agency is quasi-judicial, the '* * * most common test is to determine whether the function under consideration involves the exercise of discretion and requires notice and hearing,' all elements being required to constitute a quasi-judicial act. See, also, *Gross v. Kenton Structural & Ornamental Ironworks, Inc.* (S.D.Ohio 1984), 581 F.Supp. 390."

{¶ 20} The BTA's adjudication is a quasi-judicial proceeding that settles a "justiciable dispute requiring evaluation and resolution." *Rossford; Zangerle.* Although the BTA opens its hearings to the public under Ohio Adm.Code 5717-1-15(D), it, like all judicial bodies, requires privacy to deliberate, *i.e.*, to evaluate and resolve, the disputes. This privacy frees the BTA from the open pressure of the

litigants as it contemplates the case. Privacy provides an opportunity for candid discussion between board members and staff on the legal issues and the facts so the BTA can reach a sound decision. See *Nasrallah v. Missouri State Bd. of Chiropractic Examiners* (Nov. 26, 1996), Mo.App. No. WD51663, unreported, 1996 WL 678640. For these reasons, the Sunshine Law does not apply to adjudications of disputes in quasi-judicial proceedings, such as at the BTA. See, also, *Angerman v. State Med. Bd.* (1990), 70 Ohio App.3d 346, 591 N.E.2d 3.

{¶ 21} Moreover, the hearing examiner's report to the BTA is not a public record. R.C. 149.43(A)(1)(o) defines "public record" as "any record that is kept by any public office * * * except * * * [r]ecords the release of which is prohibited by state or federal law." In *State ex rel. Thomas v. Ohio State Univ.* (1994), 71 Ohio St.3d 245, 249, 643 N.E.2d 126, 130, we ruled that common-law privileges, such as the attorney-client privilege, are state laws that prohibit release of public records. See, also, *Woodman v. Lakewood* (1988), 44 Ohio App.3d 118, 541 N.E.2d 1084.

{¶ 22} In *State ex rel. Steffen v. Kraft* (1993), 67 Ohio St.3d 439, 440, 619 N.E.2d 688, 689, we denied permission to a litigant to review a judge's personal trial notes because, *inter alia*, this "would intrude upon a judge's subjective thoughts and deliberations, threatening the orderly administration of justice. If notes were available, counsel could presumably ask the court to explain the notes, such as why the court recorded some events and not others, or why the trial court characterized certain events in a certain manner." This statement describes the "judicial mental process" privilege.

{¶ 23} *United States v. Morgan* (1941), 313 U.S. 409, 421-422, 61 S.Ct. 999, 1004-1005, 85 L.Ed. 1429, 1435-1436, provides an early discussion of this privilege as it pertains to administrative agencies:

"* * * But, finally, a matter not touching the validity of the order requires consideration. Over the Government's objections, the district court authorized the market agencies to take the deposition of the Secretary [of Agriculture]. The

Secretary thereupon appeared in person at the trial. He was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates. His testimony shows that he dealt with the enormous record in a manner not unlike the practice of judges in similar situations, and that he held various conferences with the examiner who heard the evidence. Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary 'has a quality resembling that of a judicial proceeding.' *Morgan v. United States*, 298 U.S. 468, 480 [56 S.Ct. 906, 911, 80 L.Ed. 1288, 1294]. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that 'it was not the function of the court to probe the mental processes of the Secretary.' 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129, 1132]. Just as a judge cannot be subjected to such a scrutiny, compare *Fayerweather v. Ritch*, 195 U.S. 276, 306-07 [25 S.Ct. 58, 67, 49 L.Ed. 193, 214], so the integrity of the administrative process must be equally respected. See *Chicago, B. & Q. Ry. Co. v. Babcock*, 204 U.S. 585, 593 [27 S.Ct. 326, 327, 51 L.Ed. 636, 638]. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instruments of justice and the appropriate independence of each should be respected by the other. *United States v. Morgan*, 307 U.S. 183, 191 [59 S.Ct. 795, 799, 83 L.Ed. 1211, 1217]."

{¶ 24} As one of the steps to concluding in *State ex rel. Ormet Corp. v. Indus. Comm.* (1990), 54 Ohio St.3d 102, 107, 561 N.E.2d 920, 925, "[t]hat the decision-maker, must, in *some meaningful manner*, consider evidence obtained at

hearing," we mentioned the *Morgan* directive that a court may not "probe the mental processes of the [agency decision-maker]." (Emphasis *sic*.)

{¶ 25} Several of our courts of appeals have applied the judicial mental process privilege to administrative decision-makers. In *Libis v. Akron Bd. of Zoning Appeals* (1972), 33 Ohio App.2d 94, 97, 62 O.O.2d 146, 148, 292 N.E.2d 642, 645, the court ruled:

"[A]n administrative officer, sitting in a quasi-judicial capacity and required to reach a conclusion based on evidence presented to him, cannot be called by either party to the proceedings and examined as to the mental processes in arriving at such conclusion." See, also, *T. Marzetti Co. v. Doyle* (1987), 37 Ohio App.3d 25, 29, 523 N.E.2d 347, 351.

{¶ 26} After reviewing this authority, we conclude that the judicial mental process privilege, a common-law privilege, is state law that prohibits release of the attorney-examiner's report to the parties. Thus, under R.C. 149.43(A)(1), this report is not a public record.

{¶ 27} This result contrasts with *State ex rel. Dist. 1199 v. Gulyassy* (1995), 107 Ohio App.3d 729, 669 N.E.2d 487, cited by appellants for support. In *Gulyassy*, the Court of Appeals for Franklin County declined to adopt a "deliberative privilege" exception to the Public Records Act. However, in *Gulyassy*, the administrative agency was not adjudicating a dispute; the agency was preparing proposals advocating amendments to statutes, an executive function. Thus, *Gulyassy* could not base an exemption from the Public Records Act in the common-law judicial mental process privilege as we do here.

{¶ 28} In proposition of law No. 2, appellants contend that the BTA failed to value the bank building. We agree.

{¶ 29} The Carrelli appraisal report does not specifically mention or value the building. On cross-examination, Carrelli acknowledged the presence of the building on the property. He thought he had included the bank's rental in the

income approach; moreover, he could not say for sure whether he had included the bank in the cost approach. The BTA concluded that Carrelli had included the bank in his income approach, which formed the basis for his final conclusion of value. Consequently, the BTA found that Carrelli had valued the bank.

{¶ 30} Carrelli set forth the rent roll for Lake Forest Place in his report. The roll shows a monthly rent of $4,944.69 on a line setting forth a Huntington Bank lease. Multiplying this amount by twelve months yields an annual rent of $59,669, the amount reported as annual rent for the bank in Ex. C-1, a 1996 marketing brochure for the property. Thus, the line in Carrelli's rent roll evidently refers to the Huntington Bank Building. This line, however, does not list any square footage for the building. The rent roll, nevertheless, lists 217,264 square feet as the total square footage for Lake Forest Place.

{¶ 31} In calculating his income approach, Carrelli multiplied the market rental of $14 per square foot by Lake Forest's total square footage of 217,264 square feet, as listed in the rent roll. Since the bank building's square footage is not included in this total square footage, we deduce that Carrelli did not apply this $14 per square foot rent figure to the bank building. Thus, the evidence does not support his statement and the BTA's finding that he included the bank building in his income approach. Accordingly, we reverse the BTA's decision and remand this matter to it to value the bank. Cf. *Webb Corp. v. Lucas Cty. Bd. of Revision* (1995), 72 Ohio St.3d 36, 647 N.E.2d 162.

{¶ 32} Next, in proposition of law No. 3, appellants argue that the BTA should not have adopted Carrelli's opinion because he had not satisfactorily supported it.

{¶ 33} Weighing evidence and granting credibility to witnesses are the BTA's statutory job. *Wolf v. Cuyahoga Cty. Bd. of Revision* (1984), 11 Ohio St.3d 205, 11 OBR 523, 465 N.E.2d 50; *Fawn Lake Apts. v. Cuyahoga Cty. Bd. of Revision* (1996), 75 Ohio St.3d 601, 665 N.E.2d 194. We leave determinations of

basic factual matters to the BTA and affirm its determinations if supported by sufficient, probative evidence of record. *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision* (1997), 77 Ohio St.3d 402, 674 N.E.2d 696. The evidence supports the BTA's findings on these asserted errors, and it did not abuse its discretion as to these claimed errors.

{¶ 34} In proposition of law No. 4, appellants contend that the BTA erred in attempting to apply a sale of the property, occurring on August 29, 1996, for $39,800,000, in valuing the property as of January 1, 1993, the tax lien date. The parties jointly placed evidence of the sale in the record, and Westlake attempted, in its brief, to factor out inflation to demonstrate that the sale price supported Carrelli's conclusion of value. Appellants claim that the BTA incorrectly relied on this sale as some evidence of value.

{¶ 35} We read the BTA's treatment of this sale differently than do appellants. The BTA ruled that the sale was not the best indication of value on tax lien date. However, the BTA, after first commenting that the sale indicated an average increase of about three percent per year over Carrelli's valuation in the three and one-half years between the sale date and the tax lien date, stated that the sale did not cause it to reject Carrelli's opinion. The BTA did not apply the sale to support Carrelli's opinion; it applied the sale to dismiss appellants' suggestion that it should reject Carrelli's opinion. In any event, the BTA found Carrelli's opinion to be the most reliable evidence of the value of the property on tax lien date. The BTA has this latitude in weighing evidence. *Witt Co. v. Hamilton Cty. Bd. of Revision* (1991), 61 Ohio St.3d 155, 157, 573 N.E.2d 661, 663.

{¶ 36} In proposition of law No. 5, appellants claim that the BTA should have "adequately" considered a stipulation in an earlier BTA case that expressed a higher value of the property for tax year 1992 as compared with Carrelli's valuation for tax year 1993. We disagree.

**{¶ 37}** We find that the BTA did not abuse its discretion in weighing the stipulation as it did.  First, the stipulation pertained to previous tax years, and one of the parties was different.  Thus, collateral estoppel would not apply.  *Hubbard Press v. Tracy* (1993), 67 Ohio St.3d 564, 621 N.E.2d 396.  Moreover, according to *Freshwater v. Belmont Cty. Bd. of Revision* (1997), 80 Ohio St.3d 26, 29, 684 N.E.2d 304, 307, "[w]hen the BTA makes a determination of true value for a given year, such determination is to be based on the evidence presented to it in that case, uncontrolled by the value assessed for prior years."  The BTA would not know what factors led to the agreement.  Did the parties sign the agreement on its merits or for some collateral considerations?  The stipulation settled the value for the years stated in the stipulation, but did not settle the valuation for subsequent years.  See *United States v. Internatl. Bldg. Co.* (1953), 345 U.S. 502, 505-506, 73 S.Ct. 807, 809, 97 L.Ed. 1182, 1188.

**{¶ 38}** Accordingly, we reverse the BTA's decision as to the bank building and remand the matter to the BTA for it to value such building.  We affirm the remainder of the decision.

*Decision affirmed in part,*

*reversed in part*

*and cause remanded.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs in judgment only.

_____