OPINION.
In this appeal, The Cincinnati Enquirer challenges the action of the Hamilton County Board of County Commissioners to convene in executive session to discuss the hiring of special legal counsel to spearhead the county's legal effort to recover cost overruns in the construction of Paul Brown Stadium. We are called upon to interpret and apply the meaning of "imminent court action" in R.C. 121.22(G)(3) — one of the exceptions to the public meetings required by the Ohio Open Meetings Act, popularly known as the Sunshine Law.
The Sunshine Law is to be liberally construed to require a public body at all times to conduct deliberations upon official business in meetings open to the public. R.C. 121.22(A). Its purpose is to assure accountability of elected officials by prohibiting their secret deliberations on public issues. State ex rel. Cincinnati Post v.Cincinnati (1996), 76 Ohio St.3d 540, 544, 668 N.E.2d 903, 906. But if specific procedures are followed, public officials may discuss certain sensitive information privately in conformity with the exceptions set forth in R.C. 121.22(G). Id. The remedy for noncompliance is to declare any resulting resolution invalid pursuant to R.C. 121.22(H), and for the court of common pleas to issue an injunction to compel the members of the public body to redeliberate the matter in accordance with the Sunshine Law. R.C. 121.22(I)(1).
The Enquirer petitioned the trial court for a writ of mandamus and an injunction, contending that the selection of special legal counsel in executive session was not in compliance with any of the statutory exceptions to a public meeting. This appeal is from the trial court's order granting the commissioners' motion for summary judgment. The primary debate concerns the exception found in R.C. 121.22(G)(3). That exception permits a public body to hold an executive session to confer with its attorney (in this case, the prosecuting attorney[1]) to discuss disputes involving the public body that are "the subject of pending or imminent court action."
According to the official minutes of the commissioners' meeting of December 27, 2000, a motion was made by Commissioner Bedinghaus to convene in executive session "for the purpose of discussing litigation." The motion was unanimously adopted. Following the executive session, attended by the Chief Assistant Prosecuting Attorney, the commissioners returned to open session and unanimously adopted a resolution that authorized the employment of the Indianapolis law firm of Ice Miller and the Cincinnati law firm of Dinsmore Shohl as special legal counsel. In explanation of the need for special legal counsel, the resolution stated that it was "in the best interest of the taxpayers of Hamilton County to thoroughly review and investigate the causes and legal responsibilities for cost overruns and any other legal issues arising from stadium construction," and that "the volume of documents and facts to be reviewed will require extensive resources not currently available to the Prosecuting Attorney." The resolution also noted that Ice Miller and Dinsmore Shohl possessed "the necessary expertise and resources required for review and evaluation of the County's legal interests."
As required by R.C. 305.14, the commissioners then applied for authorization to employ special legal counsel in the court of common pleas. In the application, the commissioners again set forth their reasons for seeking the services of outside legal help: "The nature of the issues will require the County to conduct an extensive factual investigation and review a large volume of documents, which will require resources beyond those currently available to the Prosecuting Attorney."
The record presents an initial procedural problem that must be resolved before addressing the merits of this appeal. The attachments to the commissioners' motion for summary judgment were selected photocopies of news articles published by the Enquirer and posted on its website. Attached to the Enquirer's memorandum in opposition to the motion for summary judgment was, ironically, an article from The Cincinnati Post's website. Civ.R. 56(C), however, provides the following:
 Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule.
(Emphasis added.)
 Although it is reasonably certain that the Enquirer does not deny the truth of its own published reports, the photocopied newspaper articles proffered by both the commissioners and the Enquirer do not satisfy the stated evidentiary requirements of Civ.R.56(C). As submitted by the parties, the articles are merely garden-variety hearsay. The proper procedure for conforming such documents to the requirements of Civ.R.56(C) is to incorporate them by reference in a proper affidavit made by an affiant with personal knowledge of the subject matter. Civ.R.56(E). See State ex rel. Freeman v. Morris (1991), 62 Ohio St.3d 107, 109, 579 N.E.2d 702, 703.
Here, however, neither party objected to or moved to strike any exhibits. By the weight of authority among appellate districts, any errors as to the form of the evidentiary materials provided for in Civ.R. 56(C) are deemed waived when not made the subject of an objection or a motion to strike, and it is within the trial court's discretion whether to consider any nonconforming document. Trimble-Weber v. Weber
(1997), 119 Ohio App.3d 402, 406, 695 N.E.2d 344, 346; Steinke v.Allstate Ins. Co. (1993), 86 Ohio App.3d 798, 802, 621 N.E.2d 1275,1278; Rodger v. McDonald's Restaurants of Ohio, Inc. (1982),8 Ohio App.3d 256, 258, 456 N.E.2d 162, 1265, fn. 7. The trial court's memorandum decision stated that its judgment was "based upon review of the pleadings and all relevant attachments." (Emphasis supplied.) Since the trial court manifestly considered the nonconforming exhibits in granting summary judgment to the commissioners, they are also properly the subject of our own de novo review of the record. See Murphy v.Reynoldsburg (1992), 65 Ohio St.3d 356, 360, 604 N.E.2d 138, 141.
The burden is on the public body to justify the resort to executive session under one or more of the exceptions to the Sunshine Law found in R.C. 121.22(G). State ex rel. National Broadcasting Co. v. Cleveland
(1988), 38 Ohio St.3d 79, 526 N.E.2d 786, paragraph two of the syllabus. Thus, for purposes of summary judgment, it was incumbent on the commissioners to establish below that it was beyond any factual dispute that the matters they discussed in executive session were the subject of "pending or imminent court action" within the meaning of R.C. 121.22(G)(3). It is undisputed that court action was not pending at the time they conducted the executive session. This case turns, therefore, upon whether court action was "imminent" concerning the cost overruns.
In State ex rel. Bond v. Montgomery (1989), 63 Ohio App.3d 728,580 N.E.2d 38, this court considered the meaning of "imminent court action" in R.C. 121.22(G)(3). We observed that "[a]lthough no Ohio case has specifically determined the scope or meaning of the word `imminent,' it has been defined as an action or event `on the point of happening' or one that is `impending.' Black's Law Dictionary (5 Ed. 1979) 676." Id. at 737, 580 N.E.2d at 44. See also Recchie and Cheroski, Government in the Sunshine: Open Meeting Legislation in Ohio (1976), 37 Ohio St.L.J. 497, 509-510.
The Enquirer contends that the record creates a question of fact whether court action was imminent when the commissioners went into executive session to discuss the hiring of special legal counsel. In support of its argument, the Enquirer points to the language of the commissioners' resolution, which stated that the purpose of hiring outside legal counsel was "to thoroughly review and investigate the causes and legal responsibilities for cost overruns," omitting any express reference to court action. The Enquirer also cites a Cincinnati Post article of December 29, 2000, which quoted a partner in the firm of Ice Miller as saying that he did not start a case presuming that it would end with litigation. According to the article, the partner told the reporter, "That's the last thing you want to do. It's not fair to the client; it's not fair to anyone."
Conversely, as proof that there was no factual dispute that court action was imminent, the commissioners cite an Enquirer article, published two weeks after their executive session, reporting that after the auditors' eighteen-month review of stadium contracts and change orders, "the most taxpayers can hope to recover is $18.5 million." The article also stated that "[t]he county either will have to sue or negotiate with its construction managers to recover any of the cash."
Initially we observe that the commissioners could have provided the trial court with far more compelling evidence that court action was "imminent" than newspaper articles quoting third parties, some of which were published after the fact. The trial court had a gatekeeper function requiring it to evaluate the legitimacy of the reasons given by the public body as to why it had convened in executive session. The trial court had to then determine if those reasons were in compliance with an authorized exception under R.C. 121.22(G) and were not given to thwart the general policy of open meetings. A public body cannot justify going into executive session by merely invoking the word "litigation" in its resolutions.[2]
The Enquirer, however, misperceives the term "imminent court action" as defined in our Bond case. The definition we adopted in Bond — something "about to happen" — was not meant to have strictly a temporal meaning. The definition is more elastic because of the protean nature of litigation, in which court action is not always a foregone conclusion. Litigation is an inherently complex and nuanced process. The plaintiff progresses, one step at a time, through various phases, starting with selection of legal counsel (or assemblage of a legal team), assessment of the facts and evaluation of the claim, notification of the claim and the demand, filing of pleadings and motions, pretrial discovery, settlement discussions, and ultimately, but not always, trial.
By including both "pending" court action and "imminent" court action within R.C. 121.22(G)(3), the legislature clearly contemplated that litigation need not have formally begun to reach a sensitive stage where the public's need to know is outweighed by the public body's need for confidentiality. As noted by Reechi and Peroski, "imminent" in the context of R.C. 121.22(G)(3) denotes something that "is mediate rather than immediate." Reechi and Peroski, supra, at 510. In fact, the authors even suggest that "it is probable that the provision authorizes an executive session at the point at which litigation is actually contemplated." Id. While we do not go that far, we believe that the term "imminent" is satisfied where the public body has formally committed itself to a litigative solution and assumed a litigative posture. Such a posture is frequently manifested by the public body's decision to commit government resources to the prospective litigation.
The intention of the commissioners to sue for the cost overruns was confirmed by their subsequent application to the court of common pleas for judicial authorization under R.C. 305.14(A) to employ Ice Miller and Dinsmore Shohl as special legal counsel to spearhead that effort. This action was the statutory predicate for the payment of legal fees. The commissioners' commitment of public funds reflected their earlier decision to sue.[3]
The evidentiary material before the trial court also refuted the Enquirer's argument that the commissioners' discussions were merely part of a preliminary investigation into the cost overruns. The construction auditor, Price Waterhouse Coopers, was hired by the commissioners in December 1999 to examine "thousands of changes to contracts." In an Enquirer article dated October 26, 2000, Dan Klepal wrote that the auditor reported in February 2000 that "a hurried construction schedule, lax oversight and poor record-keeping contributed to the overruns. * * * Since then, the firm [Price Waterhouse Coopers] has been inspecting every change order associated with the project, trying to figure out which are the county's responsibility and which will have to be paid by the architect, project manager or construction manager. * * * The county may be able to recover some of the money for the overruns, but only after lengthy negotiations or, possibly, lawsuits."
To accept the Enquirer's argument would require an assumption that the prosecuting attorney recommended that the commissioners hire special legal counsel merely to duplicate the audit already conducted by the accountants. In the wake of the auditor's findings, however, the hiring of special legal counsel signaled that the commissioners had moved beyond mere investigation and had assumed an aggressive litigative posture by seeking outside legal help to spearhead recovery of the funds. The prosecuting attorney informed the commissioners that he did not have the resources and that "the firms of Ice Miller and Dinsmore Shohl possess the necessary expertise and resources required for review of the County's legal interests." There was, thus, ample evidentiary support for the statement in the official minutes of December 27, 2000, that "the Board convened an executive session for the purpose of discussing litigation."
We hold, therefore, that the record does not present any dispute of material fact whether litigation or court action was imminent when the commissioners went into executive session to discuss the hiring of special legal counsel. We hold, further, that the discussion of which outside legal firm to hire for purposes of spearheading the recovery of the funds was not a matter ancillary to the litigation, since such a discussion would necessarily have entailed consideration of the various causes of action, merits, strategy, and strengths and weakness of the case all of which were highly sensitive in the context of an impending lawsuit.
The commissioners argue that the executive session to discuss the hiring of special legal counsel was also permitted under R.C. 121.22(G)(5). That exception allows the public body to convene an executive session to discuss "[m]atters required to be kept confidential by federal law or rules or state statutes." According to the commissioners, the exception applies whenever the commissioners discuss matters with the prosecuting attorney, because such discussions are protected by the attorney-client privilege codified in R.C. 2317.02. The commissioners also point to the fact that an attorney faces sanctions for disclosure of a client's confidence under DR 4-101 of the Code of Professional Responsibility.
We disagree. R.C. 121.22(G)(5) refers to matters that are "required" to be kept confidential. The commissioners, however, are under no legal duty to assert the attorney-client privilege to keep confidential every discussion that they may have with the prosecuting attorney. As noted by Reechi and Peroski, "the General Assembly, in limiting the circumstances in which such a discussion can be held in executive session, has required a partial waiver of the privilege by the client-public body." Reechi and Peroski, supra, at 510. The exception in R.C. 121.22(G)(5) is intended, rather, to allow the commissioners to convene an executive session to discuss matters that they are legally bound to keep from the public, such as records exempted from Ohio's Public Records Act (see R.C. 149.43), sealed records of criminal convictions (see R.C. 2953.35), information concerning an abortion without parental consent (see R.C. 2151.85[F]), results of HIV testing by the director of health (see R.C. 3701.241), and the like.
We hold, therefore, that the applicable exception in this case was in R.C. 121.22(G)(3). Furthermore, the exhibits before the trial court showed that there was no genuine issue as to any material fact, and that the commissioners were entitled to judgment as a matter of law on the basis that court action was "imminent" within the meaning of that statute. Summary judgment having been properly granted in favor of the commissioners, the judgment of the trial court is affirmed.
Judgment affirmed.
Sundermann and Winkler, JJ., concur.
[1] The prosecuting attorney is the "legal adviser to the board of county commissioners * * * [and] shall prosecute and defend all suits and actions which any such officer or board directs or to which it is a party * * *." R.C. 309.09(A). The commissioners may also employ legal counsel to represent the board in the prosecution or defense of an action in which it has an interest. R.C.305.14(A) and (B); R.C. 309.09(C).
[2] To satisfy the commissioners' burden of establishing an exception to a public meeting, it would have been, perhaps, more clear had the records of the official meeting contained the language of R.C.121.22(G)(3). We do not, however, endorse a rule that authorizes a public body to convene in executive session by simply reciting the words of the statutory exception.
[3] We reject the commissioners' argument that the requirement for authorization by the court of common pleas to hire special legal counsel to assist the prosecuting attorney, as provided by R.C. 305.14(A) and (B), constitutes "imminent court action." Authorization by the court of common pleas is a non-adversarial proceeding and is merely a statutory condition to payment of special counsel. The application to the court of common pleas required by R.C. 305.14 is not an "action." "An action is an ordinary proceeding in a court of justice, involving process, pleadings, and ending in a judgment or decree, by which a party prosecutes another for the redress of a legal wrong, enforcement of a legal right, or the punishment of a public offense." R.C.2307.01. See State ex rel. JeffersonCounty v. Hallock (1986), 28 Ohio St.3d 179, 182, 502 N.E.2d 1036,1039.