[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. More Bratenahl v. Bratenahl,* Slip Opinion No. 2019-Ohio-3233.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-3233

THE STATE EX REL. MORE BRATENAHL; MEADE, APPELLANT, *v.* THE VILLAGE OF BRATENAHL ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. More Bratenahl v. Bratenahl,* Slip Opinion No. 2019-Ohio-3233.]

*Civil law—Application of R.C. 121.22, Ohio's Open Meetings Act—The Open Meetings Act does not permit a governmental body to take official action by secret ballot—Maintaining secret-ballot slips as public records does not cure an R.C. 121.22 violation—Court of appeals' judgment reversed and cause remanded.*

(No. 2018-0440—Submitted March 26, 2019—Decided August 14, 2019.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 105281, 2018-Ohio-497.

_____

**DEWINE, J.**

{¶ 1} Ohio's Open Meetings Act commands, "All meetings of any public body are declared to be public meetings open to the public at all times." R.C. 121.22(C). The question before us is whether a village council complies with this directive when it elects a council officer by way of a secret ballot. We say no.

### I. A secret ballot to elect a president pro tempore of council

{¶ 2} In January 2015, the Bratenahl Village Council gathered for its first meeting of the year. Among the council's business that day was the election of a president pro tempore—someone to serve as the acting mayor when the mayor is absent or unable to perform his or her duties. *See* R.C. 731.10. After two members were nominated for the position, the following exchange was had:

MAYOR LICASTRO: Do you want to do a show of hands? Do you want to do a secret ballot?

COUNCILMEMBER BECKENBACH: Let's do secret ballot. We've always done that.

MAYOR LICASTRO: Secret Ballot. Mr. Matty?

COUNCILMEMBER BACCI: Is that legal?

SOLICITOR MATTY: Yes, it is legal.

* * *

COUNCILMEMBER BACCI: I thought I saw something in the Sunshine Law of the [Ohio Revised Code] that you can't have a secret ballot.

{¶ 3} No one replied to Councilmember Bacci's comment, and the council proceeded to vote by secret ballot. The village solicitor privately tallied the votes. Without revealing the results, he announced that the council would have to vote again because someone had voted for a person who had not been nominated. The

2

second vote was a tie, so the council voted by secret ballot a third time. Again, the village solicitor counted the votes and, without announcing the votes, declared Councilmember Jim Puffenberger the new president pro tempore.

{¶ 4} A year later, the community-news publication MORE Bratenahl and Patricia Meade, the operator of MORE Bratenahl, filed suit against the village of Bratenahl, five of the village's councilmembers, and its mayor (collectively, "Bratenahl"). MORE Bratenahl and Meade sought a declaratory judgment that Bratenahl had violated Ohio's Open Meetings Act, R.C. 121.22, by conducting public business by secret ballot, an injunction to prohibit future secret-ballot voting, reasonable attorney fees, and a civil forfeiture of $500.

{¶ 5} During discovery, Meade sought copies of the ballots. Bratenahl produced the ballot slips with sticky notes attached to them, purporting to identify the councilmember who cast each vote. Both sides filed motions for summary judgment. The trial court denied Meade's motion for summary judgment and awarded summary judgment to Bratenahl.

{¶ 6} On appeal, the Eighth District found that Meade was unable to establish that Bratenahl had violated the Open Meetings Act. It noted that, because the votes were cast in open session and were maintained as a public record, the votes were not "secret." 2018-Ohio-497, ¶ 20. Thus, there was "no evidence that Bratenahl attempted to conceal information from the public." *Id*.

{¶ 7} We accepted Meade's appeal on the question whether members of a public body violate the Open Meetings Act when they vote on matters of public business through the use of secret ballots. *See* 152 Ohio St.3d 1489, 2018-Ohio-2155, 99 N.E.3d 426.

## II. The Open Meetings Act does not permit a governmental body to take official action by secret ballot

{¶ 8} The Open Meetings Act begins with a pronouncement: "This section shall be liberally construed to require public officials to take official action and to

conduct all deliberations upon official business only in open meetings unless the subject matter is specifically excepted by law." R.C. 121.22(A). It directs that "[a]ll meetings of any public body are declared to be public meetings open to the public at all times." R.C. 121.22(C). And it further provides, "A resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body." R.C. 121.22(H). (The act includes several exceptions to its requirements, none of which are applicable here.)

{¶ 9} Bratenahl does not dispute that its council is a public body, that the election of a president pro tempore was an "official action" on "public business," or that the council's January gathering was a meeting. (A meeting is defined as "any prearranged discussion of the public business of the public body by a majority of its members." R.C. 121.22(B)(2).) The only question is whether the council acted in a meeting that was "open to the public" when it selected its president pro tempore by secret ballot.

{¶ 10} Taking a point from the introductory language of the act, Meade says that we must construe the act in favor of openness. To allow a secret ballot, she says, is inconsistent with the act's legislative purpose of allowing the public to ascertain the workings of their government.

{¶ 11} Bratenahl pushes back on such a reading. It says that the act does not prescribe a voting procedure, pointing to a municipal corporation's statutory authority "to determine its own rules." R.C. 731.45. In essence, Bratenahl contends that the act is satisfied as long as the doors to the meeting space are unlocked and the public is permitted to sit in the same room as the council.

{¶ 12} We begin our analysis with the text of the act, focusing on the ordinary meaning of its terms and its structure. Because the act does not define "open" or "open meeting," we afford the terms their plain, everyday meanings, looking to how such words are ordinarily used. *Great Lakes Bar Control, Inc. v. Testa*, 156 Ohio St.3d 199, 2018-Ohio-5207, 124 N.E.3d 803, ¶ 8-10. This work

includes reading words in their context and construing them "according to the rules of grammar and common usage." R.C. 1.42; *see also Great Lakes* at ¶ 9.

**{¶ 13}** "Open" is a word with a variety of usages. It is defined as "completely free from concealment : exposed to general or particular perception or knowledge," *Webster's Third New International Dictionary* 1579 (1966)—a definition that supports Meade's interpretation. But it can also mean more narrowly "free to be entered, visited, or used," *Webster's New International Dictionary* 1705 (1953), and "in a state which permits access, entrance, or exit," *Webster's New World Dictionary* 948 (3d College Ed.1988)—definitions more in line with Bratenahl's reading of the act.

**{¶ 14}** When we consider the full text of the act, its structure, and the legislative purpose as derived from the text of the act, we think it clear that the broader reading must carry the day. Significantly, the act does not just say that all meetings shall be open to the public. It also provides that "[a] resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body." R.C. 121.22(H). Thus, the act ties the openness requirement to official action taken at the meeting. Not only must the meeting be open, but any official action (for example, the election of a president pro tempore) must take place in an open meeting. We read this to mean that that portion of the meeting in which the formal action is taken—here, the vote—must be open.

**{¶ 15}** Further, when the text of a statute makes its purpose clear, and we must choose between two permissible readings of the statutory text, an interpretation that advances the purpose of the statute is to be preferred over one that would thwart that purpose. *See Griffin v. Oceanic Contrs., Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *see also* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 56-57 (2012). The text of the act makes clear its purpose: to require that public business be conducted in a manner that is

accessible to the public. Meade's reading advances that purpose; Bratenahl's reading does not.

**{¶ 16}** Bratenahl's reliance on the fact that the Open Meetings Act does not prescribe particular voting procedures does little to advance its cause. Just as the act does not prescribe a particular voting procedure, it does not prescribe how members are to communicate in such a meeting. But certainly, a meeting is not open if the members communicate in whispers, concealing their deliberations from the public. *See Manogg v. Stickle*, 5th Dist. Licking No. 97 CA 104, 1998 Ohio App. LEXIS 1961, *2, 4 (Apr. 8, 1998). Nor do we think it would be open if the members spoke only in Latin, or placed a screen between themselves and the audience, or took any of numerous other actions that would limit the public's ability to access their deliberations. The act may not prescribe any particular voting procedure—and a council may adopt its own rules—but none of this alters the fundamental requirement that the public have meaningful access to what takes place at the meeting.

**{¶ 17}** The reading that Bratenahl proposes—that a meeting is open as long as the doors of the meeting room are open to the public—is inconsistent with our precedent. In *State ex rel. Cincinnati Post v. Cincinnati*, we held that the act was violated when the city manager set up a series of back-to-back meetings (each attended by three of the city's councilmembers) to discuss public business prior to the regular session of the nine-member council. 76 Ohio St.3d 540, 542-543, 668 N.E.2d 903 (1996). In doing so, we looked to the legislative dictate that the statute be liberally construed and concluded that "Cincinnati's game of legislative musical chairs," *id.* at 544, was inconsistent with the statutory requirement that governmental bodies "conduct all deliberations upon official business only in open meetings." R.C. 121.22(A).

**{¶ 18}** Similarly, we have held that the act prohibited a majority of a school board from engaging in a private, prearranged discussion of public business by e-

mail that was later ratified by the board at a public meeting. *White v. King*, 147 Ohio St.3d 74, 2016-Ohio-2770, 60 N.E.3d 1234, ¶ 15, 24-25.

{¶ 19} Implicit in the *Cincinnati Post* and *White* decisions is a rejection of the view that Bratenahl advances. The act is not satisfied simply because the doors of a council meeting are open to the public. Rather, an open meeting requires that the public have meaningful access to the deliberations that take place among members of the public body, and that includes being able to determine how participants vote.

{¶ 20} Thus, we hold that the Open Meetings Act precludes a public body from taking official action by way of a secret ballot. Bratenahl violated the act when it elected its president pro tempore by secret ballot.

### III. Maintaining secret-ballot slips as public records does not cure a R.C. 121.22 violation

{¶ 21} Bratenahl also argues that since the secret-ballot slips were maintained as public records, they were not actually secret. The court of appeals reached this same conclusion, finding that since the votes were cast in open session and later made public record, they were not "secret." 2018-Ohio-497, at ¶ 20. But the availability of concealed information through a public-records request does not retroactively make a meeting with secret votes "open to the public." Besides the practical problems attending Bratenahl's position—illustrated by the sticky notes haphazardly appended to the ballot slips, supposedly identifying the voters more than a year after they had cast their votes—it lacks any support in the text of R.C. 121.22. The statute's plain language requires that public meetings remain open throughout the proceedings themselves—the prospect of future access does not make a meeting "open to the public at *all* times." (Emphasis added.) R.C. 121.22(C). The statutory burden to maintain a meeting's openness is on the public officials, not the public. R.C. 121.22(A) and (C). Likewise, the consequence for failing to adopt a formal action in an open meeting—invalidation of that action—

falls on the public body. R.C. 121.22(H). Thus, the availability of secret-ballot slips as a public record does not retroactively make a meeting compliant with the act.

### IV.  The matter is not moot

{¶ 22} Bratenahl argues that since the president pro tempore's term has expired, the issue is moot. But again, the statute's plain terms refute this argument. R.C. 121.22(I)(1) provides:

> Any person may bring an action to enforce this section. An action under division (I)(1) of this section shall be brought within two years after the date of the alleged violation or threatened violation. Upon proof of a violation or threatened violation of this section in an action brought by any person, the court of common pleas shall issue an injunction to compel the members of the public body to comply with its provisions.

{¶ 23} Thus, the act specifically allows a party to bring an action within two years of a violation—as Meade did. And when a violation or threatened violation is proven, it mandates the issuance of an injunction. Because the act, by its terms, anticipates exactly the type of action Meade pursued, we have little difficulty concluding that the matter is not moot.

### V.  Conclusion

{¶ 24} We hold that the use of secret ballots in a public meeting violates the Open Meetings Act. Accordingly, we remand this matter to the court of common pleas to issue an injunction under R.C. 121.22(I)(1), order the village council to pay a civil forfeiture under R.C. 121.22(I)(2)(a), and award any other relief consistent with R.C. 121.22.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, DONNELLY, and STEWART, JJ., concur.

_____

Finney Law Firm, L.L.C., Brian C. Shrive, Christopher P. Finney, and Justin C. Walker; and the Law Firm of Curt C. Hartman and Curt C. Hartman, for appellant.

Matty, Henrikson & Greve, L.L.C., David J. Matty, Shana A. Samson, and Mark B. Marong, for appellees.

Frost Brown Todd, L.L.C., Ryan W. Goellner, and Monica L. Dias, urging reversal for amici curiae Ohio Coalition for Open Government, Reporters Committee for Freedom of the Press, and Ohio Association of Broadcasters.

_____