THE STATE EX REL. DANN *v.* TAFT.

[Cite as *State ex rel. Dann v. Taft,*
109 Ohio St.3d 364, 2006-Ohio-1825.]

(No. 2005–1222—Submitted November 9, 2005—Decided April 13, 2006.)

MOYER, C.J.

{¶ 1} This is an original action in mandamus filed by relator, Marc Dann, seeking a writ ordering respondent, Governor Bob Taft, to disclose certain weekly reports prepared for him by executive-branch officials. Dann, a member of the Ohio Senate, claims in a complaint filed in his individual capacity that the governor has a clear legal duty to disclose to Dann the weekly reports pursuant to R.C. 149.43, the Public Records Act. The governor has filed a motion for protective order relative to Dann's discovery requests. Dann has filed a motion to compel discovery.

{¶ 2} Our decision on the merits, as well as disposition of these motions, is contingent upon determination of the following issue: may a governor of Ohio assert executive privilege as a legitimate basis for maintaining the confidentiality of documents prepared for his or her review? The issue of gubernatorial executive privilege is a matter of first impression in this court.

{¶ 3} We hold that a governor of Ohio possesses a qualified privilege by which communications to or from him or her will, under certain circumstances, be accorded confidentiality and deemed beyond the scope of discovery under the Rules of Civil Procedure as well as the Public Records Act. In addition to defining the scope of that qualified privilege, we establish a framework by which the validity of the governor's claim of executive privilege will be determined.

## I

### Factual and Procedural Background

#### A

#### The Governor's Weekly Reports

{¶ 4} The executive branch of state government comprises 18 state departments and over 200 boards, commissions, and authorities. These executive agencies are responsible for formulating policies, enforcing laws, and providing services to Ohio residents over a wide range of substantive areas. The cabinet agencies include the 18 state departments and seven other major boards or commissions, including the Bureau of Workers' Compensation. The governor employs executive assistants, who act as policy advisors in various matters and as liaisons to specific clusters of cabinet agencies. The governor's office uses several methods to communicate with subordinate executive officers to keep apprised of significant developments, policies, issues, and concerns occurring within the executive branch. Those methods include face-to-face meetings with agency employees, memoranda and correspondence, meetings between the executive assistants and agency personnel, telephone contacts, and e-mail.

{¶ 5} Cabinet directors and executive assistants to the governor also communicate with the governor's office through weekly reports. Cabinet directors prepare these short topical reports at the end of each week and send them to a person in the governor's office. The reports are available for review over the weekend before the governor's weekly policy meeting with his executive staff on Monday afternoons. At the end of each week, the governor receives a report from each executive assistant that advises him and his executive staff of the status of issues.

{¶ 6} The formats and styles of the weekly reports vary, with each cabinet director and executive assistant expected to use his or her best judgment to decide what topics to include and how detailed the discussion should be. The reports typically contain information concerning significant events and particular concerns, issues, or information that the cabinet directors and executive assistants believe should be brought to the attention of the governor. Many of the topics in the weekly reports are strictly informational and do not require any

action by the governor, and some of the information is not sensitive, confidential, or proprietary.

{¶ 7} If a topic or issue requires a more detailed explanation or analysis, it is usually presented through some means other than the weekly reports, e.g., a specific memorandum on that issue or a meeting. In fact, cabinet members often withhold sensitive information from the weekly reports and use other means to communicate this information to the governor.

{¶ 8} In any week, one or more of the reports may require action by the governor in the form of advice, a recommendation, or a decision and may contain information that the governor considers sensitive and confidential. Weekly reports may also contain candid comments, opinions, criticism, and analyses by the cabinet director or executive assistant.

{¶ 9} The weekly reports constitute one institutional written means of communication used by the governor. They are distributed to the governor, his executive staff, and some administrative personnel. There are no written guidelines or policies in the governor's office concerning the dissemination of the weekly reports. Copies of weekly reports may be released to the public when requested if the request addresses a particular topic or agency and a specific, narrow period of time and the matter is not otherwise deemed to be privileged. The governor's office does not release weekly reports if the request is not limited to a particular topic, agency, or period of time.

## B

## Case History

{¶ 10} In the spring of 2005, several Ohio newspapers reported that questionable investment practices had produced a significant loss in the employer-contribution fund of the Bureau of Workers' Compensation. On June 13, 2005, relator requested from respondent, Ohio Governor Bob Taft, copies of "[a]ll weekly memoranda or other periodic reports required by statute or office procedure or practice from former Bureau of Workers' Compensation Administrator and CEO James Conrad to the Office of Governor from the years 1998–2005." The governor disclosed the requested records for the period from August 2004 to June 15, 2005, but refused to provide copies of Conrad's weekly reports from 1998 until August 2004. The governor claimed that these weekly reports "are protected by the executive privilege."

{¶ 11} On June 16, 2005, Dann, as a private citizen, requested that the governor provide copies of additional records, including weekly reports prepared by James Samuel, for the years 1998 to 2005. As the governor's executive

assistant for business and industry, Samuel acted as a liaison between the governor and the bureau.

{¶ 12} The governor reaffirmed his decision to withhold most of the requested reports from Conrad to the governor's office and further denied Dann's request for copies of requested reports from Samuel to the governor because of "executive privilege and deliberative process privilege."

{¶ 13} On that same day, Dann filed this action for a writ of mandamus to compel the governor to make the requested records available for inspection and copying under R.C. 149.43, the Public Records Act. According to Dann, he had requested the records "to obtain more detailed information regarding the governor's awareness of the investment practices of the Ohio Bureau of Workers' Compensation * * * and its related entities."

{¶ 14} We granted an alternative writ and ordered an accelerated evidence and briefing schedule. 106 Ohio St.3d 1457, 2005-Ohio-3519, 830 N.E.2d 1166. Dann served notices of deposition on the governor, Conrad, Samuel, Jon Allison (the governor's chief of staff), Brian Hicks (the governor's former chief of staff), and Mark Nedved (the former legislative liaison for the bureau).

{¶ 15} The governor moved for a protective order to preclude the taking of the depositions, citing government-official, executive, and deliberative-process privileges. He instead offered Dann the opportunity to depose Kate Bartter, the governor's chief policy advisor and director of cabinet affairs. In that capacity, Bartter is the official custodian of the weekly reports, and she has personal knowledge of their general content and use in the governor's office. According to the governor, Bartter would be able to provide Dann with "general, non-privileged information as to the contents of weekly reports, the distribution of the weekly reports within the office, and the general use and function of the weekly reports within the executive branch."

{¶ 16} The governor moved to dismiss Dann's complaint, claiming that he had produced documents in response to Dann's requests and that the action was thus moot. But the Samuel reports that the governor did provide to Dann contained redactions, and over 200 other Samuel reports were withheld based on the governor's conclusion that they did not contain information relating to the bureau from 1999 to 2005.

{¶ 17} We denied the governor's motion to dismiss and stayed the filing of evidence and briefs until further order. 106 Ohio St.3d 1475, 2005-Ohio-3977, 832 N.E.2d 60. We also held in abeyance the governor's motion for protective order and Dann's motion to compel discovery. 106 Ohio St.3d 1495, 2005-Ohio-4370, 833 N.E.2d 299. We stayed all further discovery and ordered the parties to brief the following issues:

{¶ 18} "1) Whether the Governor of Ohio may claim an executive privilege to prevent disclosure of documents provided to the Governor by staff members or other executive-branch officials.

{¶ 19} "2) Whether the Governor of Ohio and other high-ranking government officials may claim an executive privilege, or other justification, to prevent discovery by deposition or as otherwise authorized by the Ohio Rules of Civil Procedure."

## II

### Privilege in Context of Public Records Act Requests

{¶ 20} It has long been the policy of this state, as reflected in the Public Records Act and as acknowledged by this court, that open government serves the public interest and our democratic system. We have repeatedly espoused this principle: " 'R.C. 149.43 [the Public Records Act] is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records.' " (Brackets sic.) *Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, 821 N.E.2d 564, ¶ 7, quoting *State ex rel. Cincinnati Enquirer v. Hamilton Cty.* (1996), 75 Ohio St.3d 374, 376, 662 N.E.2d 334.

{¶ 21} There is no dispute that the governor's office is a public office, the governor is a public official, and the requested weekly reports are records for purposes of R.C. 149.43. See R.C. 149.011(A), (D), and (G). However, by the express language of R.C. 149.43, not every record produced or kept by a public office is a "public record" falling within the scope of the act. The General Assembly exempted certain types of governmental records from the disclosure requirement. As relevant here, R.C. 149.43(A)(1) provides:

{¶ 22} "(A) As used in this Section:

{¶ 23} "(1) 'Public record' means records kept by any public office. * * * 'Public record' does not mean any of the following:

{¶ 24} "* * *

{¶ 25} "(v) Records the release of which is prohibited by state or federal law."

{¶ 26} We have previously recognized that certain privileges exempt records from disclosure under R.C. 149.43 because their release is "prohibited by state or federal law" under R.C. 149.43(A)(1)(v). In *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990, ¶ 24, we observed that records of communications between attorneys and their state-government clients pertaining to the attorneys' legal advice do not fall within the scope of the Public Records Act, since the release of these records is prohibited by state law, i.e., they are protected by this state's common law of attorney-client privilege. We rejected the relator's argument that because the statutory version

of the privilege does not apply to government clients, the records must be disclosed: "Even assuming that R.C. 2317.02(A) does not extend attorney-client privilege to government entities (see R.C. 2317.021, defining 'client'), the common-law attorney-client privilege recognized in Ohio would apply." Id. at ¶ 26.

{¶ 27} We have also recognized that certain papers executed by members of the judicial branch of government are beyond the scope of the Public Records Act. A trial judge's personal handwritten trial notes are not public records subject to the act: "permitting a litigant access to a judge's personal trial notes would intrude upon a judge's subjective thoughts and deliberations, threatening the orderly administration of justice." State ex rel. Steffen v. Kraft (1993), 67 Ohio St.3d 439, 440, 619 N.E.2d 688. Similarly, in TBC Westlake, Inc. v. Hamilton Cty. Bd. of Revision (1998), 81 Ohio St.3d 58, 64, 689 N.E.2d 32, we characterized the above statement as describing the common-law "judicial mental process privilege," and we relied on it to exempt an attorney-examiner's report prepared for the Board of Tax Appeals from the Public Records Act. We concluded that "the judicial mental process privilege, a common-law privilege, is state law that prohibits release of the attorney-examiner's report to the parties. Thus, under R.C. 149.43(A)(1), this report is not a public record." Id. at 64, 689 N.E.2d 32.

{¶ 28} Pursuant to the definition of public records in R.C. 149.43(A)(1)(v), privileged records do not fall within the scope of the Public Records Act because state law prohibits compelled disclosure of privileged material. If gubernatorial communications are indeed privileged, they do not fall within the scope of the act. They are simply not "public" records, but rather confidential records.

{¶ 29} Thus, pursuant to the Public Records Act, the question whether executive privilege exists in Ohio as a matter of statutory or common law is a threshold issue that must be determined in this case. If the governor is correct in asserting the existence of an executive privilege and its applicability to the weekly reports, Dann has no right of access to them under the Public Records Act.

{¶ 30} No statute establishes executive privilege. The governor argues, however, that Section 6, Article III of the Ohio Constitution vests him with the authority to determine for himself whether the weekly reports sought by Dann under the Public Records Act are confidential. Section 6, Article III grants the governor the authority to "require information, in writing, from the officers in the executive department, upon any subject relating to the duties of their respective offices." He argues that this provision bars the General Assembly from including within the scope of the Public Records Act documents provided to him.

{¶ 31} The text of Section 6, Article III does not include language warranting the conclusion that information provided to the governor pursuant to that section

should be considered proprietary to him or otherwise confidential. We therefore reject the governor's attempt to create what would amount to an absolute privilege for gubernatorial communications based on Section 6, Article III.

## III

### The Concept of Executive Privilege, Allowing a Person Holding the Highest Public Executive Office to Withhold Some Communications from Public Disclosure, Is Well Established

{¶ 32} In the absence of controlling Ohio statutory, constitutional, or common-law authority concerning gubernatorial executive privilege, it is appropriate to review federal law and the law of other states that have addressed the issue of executive privilege.

### A

### Federal Law of Executive Privilege

{¶ 33} Executive privilege has been asserted by the executive branch of the United States to protect various types of information, including military and state secrets, the identity of confidential government informants, and facts concerning pending investigations.[1] See *United States v. Reynolds* (1953), 345 U.S. 1, 6–8, 73 S.Ct. 528, 97 L.Ed. 727; *Totten v. United States* (1875), 92 U.S. 105, 106–107, 23 L.Ed. 605; *Roviaro v. United States* (1957), 353 U.S. 53, 59–61, 77 S.Ct. 623, 1 L.Ed.2d 639. Presidents have also asserted a common-law privilege, commonly referred to as the "deliberative process" privilege, which protects against disclosure of government documents prepared in connection with deliberation and decisionmaking. See, generally, *In re Sealed Case* (C.A.D.C.1997), 121 F.3d 729, 736–741. Yet another category of federal common-law privilege is the presidential-communications privilege, which is based on the constitutional principle of separation of powers. *United States v. Nixon* (1974), 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

### 1

### Deliberative–Process Privilege

{¶ 34} The most frequently asserted form of executive privilege is the "deliberative process" privilege; "it allows the government to withhold documents and

---

1. For example, President Franklin D. Roosevelt refused to give Congress FBI investigative files, President Eisenhower invoked executive privilege on over 30 occasions, and President Kennedy cited the privilege to prevent congressional oversight of foreign policy. See Priester, Rozelle, and Horowitz, The Independent Counsel Statute: A Legal History (1999), 62–WTR Law & Contemp. Probs. 5, 79. See, also, Iraola, Congressional Oversight, Executive Privilege, and Requests for Information Relating to Federal Criminal Investigations and Prosecutions (2002), 87 Iowa L.Rev. 1559, 1570.

other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *In re Sealed Case,* 121 F.3d at 737, quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena* (D.D.C.1966), 40 F.R.D. 318, 324. Predecisional and deliberative materials are protected, but documents that merely state or explain a decision that has already been made or contain purely factual information are not. *Judicial Watch, Inc. v. Dept. of Justice* (C.A.D.C.2004), 365 F.3d 1108, 1113; *Colorado Springs v. White* (Colo.1998), 967 P.2d 1042, 1051. The privilege extends beyond the chief executive officer of a governmental unit such as a president or governor. *Daily Gazette Co., Inc. v. West Virginia Dev. Office* (1996), 198 W.Va. 563, 572, 482 S.E.2d 180. This category of executive privilege is grounded in judicial recognition of a "valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties." *United States v. Nixon,* 418 U.S. at 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039. It does not have its underpinnings in the constitutional doctrine of separation of powers. Id.

{¶ 35} At different pertinent times in this case, including in his motion for protective order, the governor asserted deliberative-process privilege as justification for his refusal to disclose the weekly reports requested by Dann. He now, however, expressly disclaims any reliance on that privilege, and we accordingly do not examine the common-law deliberative-process privilege in today's decision.

## 2

### Presidential–Communications Privilege

{¶ 36} The governor asserts that an executive privilege analogous to the presidential-communications privilege should be recognized in Ohio and applied to protect the confidentiality of the weekly reports.

{¶ 37} The seminal federal case recognizing and interpreting the presidential-communications privilege arose when President Nixon invoked the privilege in an attempt to quash a subpoena from a special prosecutor for the Watergate tapes in a criminal case naming the President as an unindicted coconspirator. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039. In a unanimous opinion authored by Chief Justice Burger, the United States Supreme Court recognized that certain presidential communications were entitled to a presumptive privilege justified by the public's interest in ensuring that the president may receive frank and candid information requisite to wise decisionmaking:

{¶ 38} "The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public

interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. *A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.*" (Emphasis added.) Id. at 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ 39} Because "a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual,' " it is "necessary in the public interest to afford Presidential confidentiality the greatest protection consistent with the fair administration of justice." Id. at 715, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ 40} The court recognized that "the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. * * * [T]he privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings." (Footnotes omitted.) Id. at 705–706, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ 41} We have found no more precise and persuasive statement of the rationale for executive privilege than these words in the unanimous opinion of the Supreme Court of the United States. The rationale applies with equal force to the chief executive official of a state.

{¶ 42} Under federal law, "[u]nlike the deliberative process privilege, which is a general privilege that applies to all executive branch officials, the presidential communications privilege is specific to the President and 'applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones.' " *Judicial Watch,* 365 F.3d at 1113–1114, quoting *Sealed Case,* 121 F.3d at 745. The presidential-communications privilege thus does not protect "only the deliberative or advice portions of documents." *Sealed Case,* 121 F.3d at 745. That is, final or postdecisional materials "often will be revelatory of the President's deliberations—as, for example, when the President decides to pursue a particular course of action, but asks his advisers to submit follow-up reports so that he can monitor whether this course of action is likely to be successful. The release of final and post-decisional materials would also limit the President's

ability to communicate his decisions privately, thereby interfering with his ability to exercise control over the executive branch." Id. at 745–746.

{¶ 43} The United States Supreme Court justified a distinction between the presidential-communications and deliberative-process privileges because the "presidential privilege is rooted in constitutional separation of powers principles and the President's unique constitutional role," whereas "the deliberative process privilege is primarily a common law privilege." Id. at 745, citing *Nixon v. Fitzgerald* (1982), 457 U.S. 731, 732, 102 S.Ct. 2690, 73 L.Ed.2d 349.

{¶ 44} Ultimately, however, the court in *United States v. Nixon* held that under the facts of that case, the presumptive privilege in presidential communications "cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice" and that the "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." 418 U.S. at 713, 94 S.Ct. 3090, 41 L.Ed.2d 1039. The court required Nixon to provide the requested tapes to the special prosecutor.

## B

### State Law of Executive Privilege

{¶ 45} "It is generally acknowledged that some form of 'executive privilege' is a necessary concomitant to executive power." Annotation, Construction and Application, Under State Law, of Doctrine of Executive Privilege (1981), 10 A.L.R.4th 355, 357. Other states that have recognized executive privilege have not deemed it to be absolute. "[M]odern authority has generally held that the privilege not to disclose information in the possession of the governor is qualified, and that determination of the existence of the privilege is within judicial discretion, based on a determination respecting whether or not the particular disclosure would be contrary to the public interest." Id. at 358.

{¶ 46} In an early case involving a request for disclosure of certain documents resulting from an investigation of a state office, the governor of Arizona alleged that it was his duty to determine whether, and to what extent, information reaching him in his official capacity should be made public. *Mathews v. Pyle* (1952), 75 Ariz. 76, 251 P.2d 893. As in the case at bar, the governor argued that his determination should be deemed final and beyond the scope of judicial review.

{¶ 47} The Supreme Court of Arizona rejected the argument, characterizing it as "inconsistent with all principles of Democratic Government." Id. at 80–81, 251 P.2d 893. It acknowledged that the governor possessed the authority initially to deny a right of inspection "if he thinks that the document is privileged or confidential, or if he thinks that it would be detrimental to the interests of the state to permit its contents to be known either to newspaper editors or other

citizens." Id. The court made it clear, however, that the ultimate determination of that issue rested with the judicial branch. It instructed the trial court, on remand, to order disclosure only if it found that the documents were "not confidential or that a disclosure of their contents would not be detrimental to the best interests of the state." Id. at 81, 251 P.2d 893.

{¶ 48} In 1978, the Supreme Court of New Jersey, citing *Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, accorded its governor "a qualified power to protect the confidentiality of communications pertaining to the executive function" analogous to the qualified constitutionally based privilege of the President. *Nero v. Hyland* (1978), 76 N.J. 213, 225, 386 A.2d 846. Other state courts that have addressed the issue have similarly recognized that "a governor, in the discharge of official duties, is entitled to an executive privilege analogous to the President's." *Doe v. Alaska Superior Court, Third Judicial Dist.* (Alaska 1986), 721 P.2d 617, 623.[2]

{¶ 49} Neither the Supreme Court of the United States nor state supreme courts have been persuaded by arguments similar to those asserted by relator here that the recognition of an executive privilege threatens the viability of our democratic institutions. Rather, to the extent that an executive privilege facilitates candor and open, vigorous debate in the formulation of public policy, it lubricates the decisional process.

## IV

### Qualified Gubernatorial–Communications Privilege in Ohio

#### A

### Confidential Communications in the Legislative and Judicial Branches

{¶ 50} Confidentiality of certain internal communications in the legislative and judicial branches of Ohio government has been recognized. Section 13, Article II, Ohio Constitution expressly states that "[t]he proceedings of both Houses shall be public, except in cases which, in the opinion of two-thirds of those present, require secrecy." The General Assembly itself has recognized the necessity of limited confidentiality in R.C. 101.30(B), which provides that legislative documents arising out of the confidential relationship between legislative staff,

---

2. See, also, *Hamilton v. Verdow* (1980), 287 Md. 544, 556, 414 A.2d 914 ("the Governor is entitled to the same privileges and exemptions in the discharge of his duties as is the President"); *Killington, Ltd. v. Lash* (1990), 153 Vt. 628, 636, 572 A.2d 1368 ("Federal and state courts have accorded to the chief executive of the nation or of a state [an executive] privilege"); *New England Coalition for Energy Efficiency & Environment v. Office of Governor* (1995), 164 Vt. 337, 341, 670 A.2d 815; *Guy v. Judicial Nominating Comm.* (Del.Super.1995), 659 A.2d 777, 783.

General Assembly staff, and each member of General Assembly are not public records under R.C. 149.43.

{¶ 51} That documents reflecting the adjudicative process of courts are confidential is well established and universally accepted. See discussion above at Section II. In *State ex rel. Steffen v. Kraft,* 67 Ohio St.3d at 440, 619 N.E.2d 688, we held that "if R.C. 149.43 were interpreted to mandate public access to a trial judge's personal notes, that result could be construed as an unconstitutional legislative encroachment upon the independence of the judiciary."

B

The Governor's Status as Chief Executive Officer in a State Government of Three Coequal Branches Justifies Recognition of a Qualified Gubernatorial–Communications Privilege

{¶ 52} Section 5, Article III of the Ohio Constitution specifies that "[t]he supreme executive power of this State shall be vested in the governor," and Section 6, Article III imposes a duty on the governor to "see that the laws are faithfully executed." The governor is thus the chief executive officer of the state and possesses authority comparable to that of the executive authority exercised by the President under Sections 1 and 3, Article II of the United States Constitution.

{¶ 53} Dann correctly notes that the drafters of the 1802 Ohio Constitution contemplated that the executive and judicial branches would be subordinate to the legislative branch. He argues that communications to and from the highest official of the executive branch therefore should not be accorded confidentiality.

{¶ 54} We acknowledge that early versions of the Ohio Constitution severely restricted the governor's powers, in part based upon the distrust of a strong executive after Arthur St. Clair's turbulent term as governor of the Northwest Territory, and that the 1851 Ohio Constitution curtailed legislative power and increased judicial authority. Terzian, Ohio's Constitutions: An Historical Perspective (2004), 51 Cleve.St.L.Rev. 357, 358, 364, 378. But over the years, various constitutional amendments increased the power of the executive branch to achieve a rough equality with the other branches, as noted in our cases. For example, in 1903, the Ohio Constitution was amended to give the governor the power to veto legislation adopted by the General Assembly. Section 16, Article II, Ohio Constitution. A 1912 amendment to that provision gave the governor the line-item veto for appropriation bills, which is a power exceeding that of the President. Id.

{¶ 55} The principle of separation of powers into three coequal branches— executive, legislative, and judicial—and the checks and balances that principle

ensures are now deemed fundamental to our democratic form of government. "While Ohio, unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers, this doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government." *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 158–159, 28 OBR 250, 503 N.E.2d 136.

{¶ 56} The separation-of-powers doctrine requires that each branch of government be permitted to exercise its constitutional duties without interference from the other two branches of government.[3] The gubernatorial-communications privilege protects the public by allowing the state's chief executive the freedom that is required to make decisions. Recognition of a qualified gubernatorial-communications privilege advances the same interests advanced by the analogous presidential privilege, including the "public interest in candid, objective, and even blunt or harsh opinions" in executive decisionmaking. *Nixon*, 418 U.S. at 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039. Our decision in this case will thus affect the quality of decisionmaking by the highest executive officer of Ohio government.

{¶ 57} We agree with the unassailable premise established in *Nixon*, and reiterated in federal and state case law, that the public interest is served by allowing a chief executive officer of a state or the federal government to receive information, advice, and recommendations unhampered by the possibility of

---

3. {¶ a} In *Loving v. United States* (1996) 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36, the court observed that the separation-of-powers doctrine "requires that a branch not impair another in the performance of its constitutional duties." More recently, the court noted that the "public interest requires that a coequal branch of Government 'afford Presidential confidentiality the greatest protection consistent with the fair administration of justice' * * * and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Cheney v. United States Dist. Court for the Dist. of Columbia* (2004), 542 U.S. 367, 382, 124 S.Ct. 2576, 159 L.Ed.2d 459, quoting *Nixon*, 418 U.S. at 715, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ b} See, also, *Nixon*, 418 U.S. at 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 ("The [presidential-communications] privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution"); *Sealed Case*, 121 F.3d at 745 ("The presidential privilege is rooted in constitutional separation of powers principles and the President's unique constitutional role"); *Hamilton*, 287 Md. at 562, 414 A.2d 914 ("In light of the reasons underlying the privilege, and considering the express separation of powers provision in [the Maryland Constitution], we do recognize as part of the law of this State the doctrine of executive privilege"); *Nero*, 76 N.J. at 225–226, 386 A.2d 846 (a gubernatorial-communications privilege "protects and insulates the sensitive decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security"); *State ex rel. Atty. Gen. v. First Judicial Dist. Court* (1981), 96 N.M. 254, 258, 629 P.2d 330 ("Inherent in the successful functioning of an independent executive is the valid need for protection of communications between its members").

compelled disclosure of every utterance made, and every piece of paper circulating, in the governor's office.

{¶ 58} The people of Ohio have a public interest in ensuring that their governor can operate in a frank, open, and candid environment in which information and conflicting ideas, thoughts, and opinions may be vigorously presented to the governor without concern that unwanted consequences will follow from public dissemination. It is for the benefit of the public that we recognize this qualified privilege and not for the benefit of the individuals who hold, or will hold, the office of governor of the state of Ohio.

{¶ 59} Consequently, and in accordance with the persuasive weight of authorities that have addressed these issues, we recognize a qualified gubernatorial-communications privilege in Ohio. Because communications to or from an Ohio governor are qualifiedly privileged, a governor's initial assertion that a communication is within the scope of this privilege is not conclusive. It is ultimately the role of the courts to determine, on a case-by-case basis, whether the public's interest in affording its governor an umbrella of confidentiality is outweighed by a need for disclosure.

{¶ 60} Accordingly, we hold that a governor of Ohio has a qualified gubernatorial-communications privilege that protects communications to or from the governor when the communications were made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking. This qualified gubernatorial-communications privilege is overcome when a requester demonstrates that the requester has a particularized need to review the communications and that that need outweighs the public's interest in according confidentiality to communications made to or from the governor.

V

Procedural Framework for Invocation of Gubernatorial–
Communications Privilege

{¶ 61} Governor Taft has claimed a gubernatorial-communications privilege both to preclude discovery sought by Dann under the Civil Rules and to justify his refusal to permit disclosure of the weekly reports sought under the Public Records Act. Having recognized a qualified gubernatorial-communications privilege, we now outline the procedures we will apply to determine the validity of the governor's assertions that the weekly reports sought by the relator should remain confidential, and beyond the scope of the Public Records Act. Until the applicability of the gubernatorial-communications privilege is determined, it would be premature to dispose of the governor's motion for protective order against depositions of executive officials.

{¶ 62} When a governor's invocation of gubernatorial-communications privilege is legally challenged, a three-step process ensues to determine whether the privilege applies:

{¶ 63} • First, the governor must formally assert the privilege, resulting in a presumption that the requested documents are legally protected and confidential.

{¶ 64} • Second, to overcome the presumptive privilege, the party seeking disclosure must demonstrate a particularized need for disclosure of the material deemed confidential by the governor.

{¶ 65} • When both of these conditions have been met, the court shall order the governor to provide the material at issue for in camera review. The court must then determine whether the communications to the governor were, in fact, made for the purpose of fostering informed and sound deliberations, policymaking, and decisionmaking. If the court determines that the communications were made for the purpose of fostering informed and sound deliberations, policymaking, and decisionmaking, it will balance the requester's need for disclosure against the public's interest in ensuring informed and unhindered gubernatorial decisionmaking. The qualified privilege is overcome only where that balancing weighs in favor of disclosure.

{¶ 66} To satisfy the first of the three steps, a governor[4] must formally assert the privilege by declaring that he or she has reviewed the requested materials and concluded that the materials meet the criteria of the privilege, i.e., that they constitute a communication either to or from him and were made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking.

{¶ 67} Once the governor asserts the privilege, the burden shifts to the party seeking disclosure to produce evidence demonstrating a particularized need to overcome the privilege and examine the documents at issue. The requester, without relying on civil discovery to establish it, must demonstrate particularized, rather than generalized, need and explain why that need outweighs the qualified privilege.

{¶ 68} A requester with the authority and obligation to investigate criminal or civil matters may demonstrate a particularized need when documents are required to fully prosecute civil or criminal matters. Thus, for example, an authorized legislative committee or a grand jury may demonstrate a particularized need to obtain communications to or from the governor. Similarly, a court may find a particularized need when disclosure is sought by a uniquely qualified representative of the general public who demonstrates that disclosure of particu-

---

4. Cf. *Blumenthal v. Drudge* (D.D.C.1999), 186 F.R.D. 236, 242 ("The President alone possesses [the] authority" to invoke presidential-communications privilege).

lar information to it will serve the public interest. Particularized need, however, does not exist when privileged information can be obtained elsewhere. Whether a requester's asserted need is sufficient is a matter of law.

{¶ 69} In the absence of a proper demonstration of need, a court should respect the governor's characterization of the material as warranting confidentiality. In deferring initially to the governor's own evaluation of communications to him or her as confidential, the judicial branch accords the governor autonomy consistent with the principle of separation of powers.

{¶ 70} We share the sentiment of the Supreme Court of the United States that executive privilege should not be lightly invoked. *United States v. Reynolds,* 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727. When executive privilege is asserted in court proceedings, the judiciary "is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's [constitutional] prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These 'occasion[s]' for constitutional confrontation between the two branches' should be avoided whenever possible." *Cheney v. United States Dist. Court for the Dist. of Columbia* (2004), 542 U.S. 367, 389–390, 124 S.Ct. 2576, 159 L.Ed.2d 459, quoting *Nixon,* 418 U.S. at 692, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ 71} Where both of the first two steps have been satisfied, the court will undertake an in camera review of the requested materials and either uphold or reject the governor's claim of confidentiality. In conducting the balancing of the competing public interests of gubernatorial confidentiality and the demonstrated, particularized need for disclosure, a court may uphold, or reject, the claim of privilege in its entirety. It may require disclosure of some, but not all, of the materials sought.

{¶ 72} We acknowledge that a person invoking the Public Records Act, R.C. 149.43, is not required to demonstrate need or even to state a reason for requesting disclosure of public records pursuant to the act. *State ex rel. Fant v. Enright* (1993), 66 Ohio St.3d 186, 610 N.E.2d 997, syllabus. However, we reiterate that documents protected by the gubernatorial-communications privilege do not fall within the definition of "public records" for purposes of the act. R.C. 149.43(A)(1)(v). See Section II above. For that reason, this decision should not be construed as changing existing precedent.

VI

Application of Gubernatorial–Communications Privilege in the Case at Bar

{¶ 73} We have today established the perimeters of a qualified gubernatorial-communications privilege in Ohio. Previous orders of this court have stayed the

parties from proceeding in this case pending our resolution of the executive-privilege issues presented. 106 Ohio St.3d 1475, 2005–Ohio–3977, 832 N.E.2d 60; 106 Ohio St.3d 1495, 2005-Ohio-4370, 833 N.E.2d 299. We assume that either or both parties may wish to proceed with the submission of evidence.

{¶ 74} We therefore order that respondent, Governor Taft, may submit to this court, within 15 days of the announcement of this decision, a formal assertion of the gubernatorial-communications privilege defined in this opinion. Relator Dann may assert, within 15 days thereafter, his particularized need to review any weekly reports that the governor asserts are privileged. We defer ruling on the pending motion for protective order relating to discovery until we determine whether the governor has established a gubernatorial-communications privilege.

So ordered.

LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

RESNICK and PFEIFER, JJ., dissent.

------------

ALICE ROBIE RESNICK, J., dissenting.

{¶ 75} I fully agree with all that Justice Pfeifer has written in his powerful and compelling dissenting opinion. I write only to add that even the majority's adoption of a gubernatorial-communications privilege fails to justify the protection it affords to the documents at issue.

{¶ 76} Lying at the heart of the executive privilege for presidential or gubernatorial communications "is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential [or gubernatorial] decisionmaking. A President [or governor] and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon* (1974), 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039. This protection "is for the benefit of the public and not the governmental officials who claim the privilege." *Hamilton v. Verdow* (1980), 287 Md. 544, 563, 414 A.2d 914.

{¶ 77} The privilege "is limited to communications * * * made 'in the process of shaping policies and making decisions.'" *Nixon v. Admr. of Gen. Servs.* (1977), 433 U.S. 425, 449, 97 S.Ct. 2777, 53 L.Ed.2d 867, quoting *United States v. Nixon*, 418 U.S. at 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039. It is properly invoked when the chief executive is "asked to produce documents or other materials that reflect presidential decisionmaking and deliberations." *In re Sealed Case* (C.A.D.C.1997), 121 F.3d 729, 744. "The presidential communications privilege should never serve as a means of shielding information regarding governmental

operations that do not call ultimately for direct decisionmaking by the President." Id. at 752.

{¶ 78} The executive privilege, whatever its form, is "not to be lightly invoked." *United States v. Reynolds* (1953), 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727. The communications privilege in particular "is invoked only rarely." *Sealed Case,* 121 F.3d at 738. Otherwise, "the insubstantial exercise of the privilege inevitably bears costs in credibility and public accountability, upon which each branch of government fundamentally relies." *Killington, Ltd. v. Lash* (1990), 153 Vt. 628, 641, 572 A.2d 1368.

{¶ 79} Thus, it is imperative that the governor be required to specifically identify and precisely describe the nature of the documents sought to be protected and explain why they fall within the scope of the privilege. See *Herald Assn., Inc. v. Dean* (2002), 174 Vt. 350, 356, 816 A.2d 469; *New England Coalition for Energy Efficiency & Environment v. Office of Governor* (1995), 164 Vt. 337, 344, 670 A.2d 815; *Doe v. Alaska Superior Court, Third Judicial Dist.* (Alaska 1986), 721 P.2d 617, 626; *Black v. Sheraton Corp. of Am.* (C.A.D.C.1977), 564 F.2d 531, 543; *Thill Securities Corp. v. New York Stock Exchange* (E.D.Wis. 1972), 57 F.R.D. 133, 138; *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena* (D.D.C.1966), 40 F.R.D. 318, 326. See, also, *Reynolds,* supra, 345 U.S. at 9–10, 73 S.Ct. 528, 97 L.Ed. 727 ("Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers").

{¶ 80} In this case, Governor Taft, albeit through counsel, has been claiming all along that public access to the weekly reports from James Conrad and James Samuel "would discourage future necessarily candid advice from Directors and Executive Assistants to the Governor" and "make it impossible for Directors and staff to communicate openly and effectively with the Governor—particularly about sensitive policy initiatives, legal issues or other ideas still in the formative stages." However, the governor's office has since released all of the requested weekly reports from Conrad for the period January 1999 through August 2004 and certain weekly reports from Samuel that contain information relating to the Bureau of Workers' Compensation, and these reports do not bear out the governor's claims.

{¶ 81} These reports do not reflect gubernatorial decisionmaking, and they do not appear to meet the majority's test, i.e., they were not "made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking." Nothing about these reports is advisory, investigatory, decisional, consultative, deliberative, or sensitive in nature, at least not in any sense or to any degree that would justify their protection under the executive privilege. They are, by and large, innocuous administrative and bureaucratic transmissions, at times informative of public events, but by no means so reflective of the

sensitive decisional responsibilities of the governor as to warrant the protection of such a high privilege. Indeed, the governor's chief policy advisor and director of cabinet affairs testified at deposition that executive administrators have used other means of communicating sensitive information to the governor.

{¶ 82} It should be immediately obvious to anyone conducting a forthright review of these reports that they are manifestly distinguishable from the investigative and advisory records that have been held by various courts to raise a presumptive privilege for presidential or gubernatorial communications. They are so far removed from the vital public interest in the effectiveness of the governor's decisionmaking duties that to even suggest their entitlement to protected status makes a mockery of the executive privilege, whatever its form.

{¶ 83} And yet the majority establishes a paradigm for invoking the privilege that enables the governor to withhold the remaining undisclosed reports by Samuel without having to satisfy the criteria of the privilege. Under the majority's paradigm, the governor must first assert the privilege himself by declaring that he "has reviewed the requested materials and concluded that the materials meet the criteria of the privilege, i.e., that they constitute a communication either to or from him and were made for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking." This declaration by the governor "result[s] in a presumption that the requested documents are legally protected and confidential."

{¶ 84} But the governor is not required to explain how these reports are related to the gubernatorial decisionmaking, deliberative, or policymaking process, and the party seeking disclosure, in this case Senator Dann, is not permitted to rebut the presumption by showing that the documents sought to be withheld are unrelated to the gubernatorial decisionmaking process. As strange as it sounds, the senator cannot rebut the presumption that the criteria of the privilege have been met by showing that the criteria of the privilege have not been met. Instead, to overcome the presumptive privilege, Senator Dann "must demonstrate a particularized need for disclosure of the material deemed confidential by the governor." Only then will the majority "determine whether the communications to the governor were in fact made for the purpose of fostering informed and sound deliberations, policymaking, and decisionmaking."

{¶ 85} By requiring the senator to demonstrate a particularized need for the requested reports before a judicial determination is made as to whether the material is sufficiently related to the gubernatorial decisionmaking process to qualify for confidential treatment under the executive privilege, the majority makes it possible for the governor to withhold the documents on the basis of a privilege that is not applicable in the first place. Thus, if Senator Dann is unable to show a particularized need for the Samuel reports, the majority will deny him

access without ever deciding whether the criteria of the privilege are met. In that event, judicial control over the question of applicability will have been abdicated to the caprice of the governor.

{¶ 86} I respectfully dissent.

---

PFEIFER, J., dissenting.

{¶ 87} "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 The Writings of James Madison (1910) 103.

{¶ 88} For over 200 years, the state of Ohio has existed without a gubernatorial-communications privilege. For over 200 years, we have had an open government, with an executive branch designed to be limited in power. Why now does the governor come before this court claiming a heretofore unrecognized privilege? Are we in the midst of a crisis of state? No, the governor is in the midst of a crisis of politics. That he chooses these circumstances to assert that the privilege is "essential for effective governance" is a Farce; the majority, in ignoring our Constitution, statutes, and traditions to grant his wish, has written a Prologue to a Tragedy.

### The Applicability of the "Deliberative Process" Privilege

{¶ 89} To dissent from this court's grant of unprecedented power is not to presume to open the inner workings of the governor's office to one and all. Certainly, the governor is entitled to privacy in the making of decisions, and, to that end, the common law recognizes the "deliberative process" privilege. The deliberative-process privilege "allows the government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case* (C.A.D.C.1997), 121 F.3d 729, 737, quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena* (D.D.C.1966), 40 F.R.D. 318, 324. The aim of the privilege is to encourage unrestrained debate in the formulation of policy, but to keep public purely factual information:

{¶ 90} "Two requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative. * * * Both requirements stem from the privilege's 'ultimate purpose[, which] * * * is to prevent injury to the quality of agency decisions' by allowing government officials

freedom to debate alternative approaches in private. [*Natl. Labor Relations Bd. v. Sears, Roebuck & Co.* (1975) ], 421 U.S. [132] at 151, 95 S.Ct. [1504, 44 L.Ed.2d 29]. The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case,* 121 F.3d at 737.

{¶ 91} Why is the deliberative-process privilege not enough for the governor? We do not know. However, we do know that "where there is reason to believe [that] the documents sought may shed light on government misconduct, 'the [deliberative-process] privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.' " Id. at 738, quoting *Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs* (C.A.1, 1995), 60 F.3d 867, 885.

### The Inapplicability of *Nixon*

{¶ 92} It is appropriate only on an ironic level that the majority relies so heavily on *United States v. Nixon* (1974), 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, a case wherein President Nixon raised the lofty ideals of separation of powers and the necessity of candor in presidential decisionmaking to prevent the release of evidence about what Presidential Press Secretary Ron Ziegler famously called a "third-rate burglary." Having demeaned the office of the presidency, Nixon cloaked himself in its majesty in a vain attempt to save himself. Lest we forget, Nixon lost. But since that time, we have been living with the effects of the dicta from *Nixon* wherein the court stated that presidential communications—not just deliberative or predecisional communications—are privileged. Id. at 708–712, 94 S.Ct. 3090, 41 L.Ed.2d 1039. It is debatable whether that privilege has inured to the benefit of the republic or merely to the benefit of executives who wish to avoid embarrassment.

{¶ 93} But that is not our concern here. We are not dealing with the Presidency and its exceptional privileges. We are dealing with the governorship of Ohio. In ruling against Nixon, the court found it significant that he did "not place his claim of privilege [against disclosure] on the ground [that] they are military or diplomatic secrets. As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *Nixon,* 418 U.S. at 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039. The duties present in Article II for the President that most require secrecy—national security and diplomacy—simply are not part of the governor of Ohio's responsibilities. The *Nixon* court established the uniqueness of the federal executive-communications privilege, a privilege that owes itself to "the singularly unique role under Art. II of a

President's communications and activities, related to the performance of duties under that Article." Id. at 715, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

{¶ 94} The court makes it clear that the sensitivity of the information available to the President necessitates the privilege:

{¶ 95} "[A] President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual.' It is therefore necessary in the public interest to afford Presidential confidentiality the greatest protection consistent with the fair administration of justice. The need for confidentiality even as to idle conversations with associates in which casual reference might be made concerning political leaders within the country or foreign statesmen is too obvious to call for further treatment." (Footnote omitted.) Id.

{¶ 96} There is a dramatic difference in degree between the duties and responsibilities of the president and the Ohio governor. One has global impact daily; the other clearly does not. Though their roles may be analogous, their duties and responsibilities are far from equal. The scale of the privilege should reflect the difference in scale between the offices. The common-law deliberative-process privilege is an appropriate privilege for the governor's office.

### The Ohio Constitution and Open Records Law

{¶ 97} As the majority points out, there is an "absence of controlling Ohio statutory, constitutional, or common-law authority concerning gubernatorial executive privilege." That is exactly the point, and we need not look further. Ohio has its own Constitution and laws, and those together demonstrate this state's tradition of open government and limited gubernatorial power. There is no room under Ohio law for a gubernatorial-communications privilege.

{¶ 98} Ohio has a long tradition of open government, dating back to the formation of its Constitution. In Nixon, the court speaks of secrecy in government as mundane:

{¶ 99} "There is nothing novel about governmental confidentiality. The meetings of the Constitutional Convention in 1787 were conducted in complete privacy. * * * Moreover, all records of those meetings were sealed for more than 30 years after the Convention. * * * Most of the Framers acknowledge that without secrecy no constitution of the kind that was developed could have been written." Nixon, 418 U.S. at 706, 94 S.Ct. 3090, 41 L.Ed.2d 1039, fn. 15.

{¶ 100} Ohio history belies the court's characterization. Unlike the federal constitution, Ohio's Constitution was created in the open. Thousands of pages of contemporaneous writings, including transcripts of the debate, from Ohio's constitutional conventions of 1802, 1851, 1873, and 1912 have been published. Ohio has been open from the beginning:

{¶ 101} "The common-law right to inspect government documents has been recognized in Ohio since the earliest reported court decisions. As there was no statutory provision to the contrary (and no constitutional mandate), the right to inspect public records was subject only to the condition that the inspection did not endanger the safety of the record or unreasonably interfere with the duties of the public official having custody of the record." (Footnote omitted.) Moyer, Interpreting Ohio's Sunshine Laws: A Judicial Perspective (2003), 59 N.Y.U.Ann. Surv.Am.Law 247, 248.

{¶ 102} The Public Records Act, R.C. 149.43, is a statutory acknowledgement of Ohio's tradition of open government. As this court just stated in *Kish v. Akron,* 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 17:

{¶ 103} "[O]ur founders rejected the English common law and property theories that curtailed citizens' access to governmental information. See [*State ex rel.*] *Natl. Broadcasting Co., [Inc.* (1988) ] 38 Ohio St.3d [79] at 81, 526 N.E.2d 786; *Wells v. Lewis* (1901), 12 Ohio Dec. 170; Moyer, 59 N.Y.U.Ann.Surv.Am.L. at 247–248. Instead, our legislators, executives, and judges mandated and monitored the careful creation and preservation of public records, *White [v. Clinton Cty. Bd. of Commrs.* (1996) ], 76 Ohio St.3d [416] at 419, 667 N.E.2d 1223, and codified the people's right to access those records. Such statutes, including * * * R.C. Chapter 149, reinforce the understanding that open access to government papers is an integral entitlement of the people, to be preserved with vigilance and vigor. See, e.g., *State ex rel. Warren Newspapers, Inc. v. Hutson* (1994), 70 Ohio St.3d 619, 623, 640 N.E.2d 174; [*State ex rel. Strothers v.*] *Wertheim* [ (1997) ], 80 Ohio St.3d [155] at 157, 684 N.E.2d 1239; *Dayton Newspapers, Inc. v. Dayton* (1976), 45 Ohio St.2d 107, 109, 74 O.O.2d 209, 341 N.E.2d 576."

{¶ 104} This court in the past has emphasized that underlying the Public Records Act is the " 'fundamental policy of promoting open government, not restricting it.' " *Gilbert v. Summit Cty.,* 104 Ohio St.3d 660, 2004-Ohio-7108, 821 N.E.2d 564, ¶ 7, quoting *State ex rel. The Miami Student v. Miami Univ.* (1997), 79 Ohio St.3d 168, 171, 680 N.E.2d 956. The rule in Ohio is that public records are the people's records and that the officials in whose custody they happen to be are merely trustees for the people. *State ex rel. Patterson v. Ayers* (1960), 171 Ohio St. 369, 371, 14 O.O.2d 116, 171 N.E.2d 508. Moreover, the Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.* (1996), 75 Ohio St.3d 374, 376, 662 N.E.2d 334. Can the majority truly say that there is not "any doubt" that the governor's claimed privilege is as broad as he represents?

{¶ 105} R.C. 149.43 does provide specific exceptions to the general requirement that "all public records" be available for public review. R.C. 149.43(A)(1)(v) removes from the definition of "public record" "[r]ecords the release of which is prohibited by state or federal law." R.C. 101.30(B) excepts from the definition of public records certain documents created by legislative staff for members of the General Assembly. However, the General Assembly did not create any such exception for gubernatorial documents. This is the case despite the fact that R.C. 149.03 specifically authorizes the governor to require reports from the offices he oversees: "The governor may at any time require to be filed with him a detailed report from any state officer, board, or commission."

{¶ 106} The Ohio Constitution also specifically allows for certain legislative proceedings to be held in secret. Section 13, Article II. Although the decision to hold secret proceedings in the General Assembly requires a two-thirds vote and is rarely used, no section provides for any type of similar secrecy for gubernatorial communications. The constitution does expressly contemplate communications between the governor and other persons within the executive branch. Section 6, Article III grants the governor the authority to "require information, in writing, from the officers in the executive department, upon any subject relating to the duties of their respective offices," but does not grant the governor the authority to keep that information secret.

{¶ 107} The majority recognizes that Ohio is a state that has severely restricted the powers of governors. Governor Thomas Corwin told friends that "they overestimated the honor of being Governor of Ohio. The framers of the constitution stripped the Governor of Ohio of all power and made him a mere dummy to fill the Governor's chair." John Jay Janney and his "Recollections of Thomas Corwin" (1964), 73 Ohio History 100, 109.

{¶ 108} Over the years, the Ohio Constitution has been amended to give more power to the governor. The General Assembly has set forth duties and powers of the governor in legislation. Those powers, which are carefully described by constitutional amendment and statute, have never included an entitlement to a gubernatorial-communications privilege.

Separation of Powers

{¶ 109} Section 2, Article I of the Ohio Constitution lays to rest any concerns about a gubernatorial privilege being necessary to preserve the separation of powers. That section reads: "[N]o special privileges or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly." The Ohio Constitution grants the power to the General Assembly to lay waste to any privilege claimed by the governor or acknowledged by this court. Ohio, which, as the majority acknowledges, "unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers," does

specifically establish the primacy of the General Assembly in regard to privileges and immunities.

{¶ 110} The majority establishes the gubernatorial privilege as an inherent, constitutional power that is untouchable by the General Assembly. This phantom constitutional privilege is in complete contravention of Section 2, Article I, an actual constitutional provision, which gives the General Assembly the power to alter, repeal, or revoke any privilege.

{¶ 111} The majority seems to imply that because the legislature has a statutorily created privilege, and the courts have a common-law privilege protecting certain notes from disclosure under the Public Records Act, the governor should also have some privilege to keep him on equal footing with the other branches of government. The three branches of government, however, are not three children that must be treated equally to ensure domestic peace. Moreover, the privilege requested by the governor dwarfs those enjoyed by the General Assembly and the judicial branch. It is as if one sibling demands a bakery because his two siblings received a piece of pie.

{¶ 112} As mentioned above, R.C. 101.30(B) excepts from the definition of "public records" certain documents created by legislative staff for members of the General Assembly. The extremely limited exception to the Public Records Act for the courts was set forth in *State ex rel. Steffen v. Kraft* (1993), 67 Ohio St.3d 439, 440, 619 N.E.2d 688, where this court held that the notes a judge took as he presided over a murder trial were not public records under R.C. 149.43. This court wrote that R.C. 149.43(A)(1) "does not define a 'public record' as any piece of paper on which a public officer writes something. No law or regulation requires such notes." Id. at 440, 619 N.E.2d 688. This is to be contrasted with reports prepared for the governor by his directors, administrators, and commissioners. Although R.C. 149.03 and Section 6, Article III of the Ohio Constitution do not *require* the submission of reports to the governor by other executive officers, those reports are accounted for in statute and constitutionally, in contrast to the type of writings we dealt with in *State ex rel. Steffen*. There is no doubt that this court would extend the note-taking privilege to the governor were he to seek it. Nor is there any doubt that this court would recognize a deliberative-process privilege applicable to the governor were he to request it. Instead, he has asked for the moon. And this court has given it to him—the governor emerges from this case with a communications privilege grossly out of scale with his own responsibilities and with the privileges accorded the other branches of government.

### The Public Interest

{¶ 113} The majority writes:

{¶ 114} "We agree with the unassailable premise established in *Nixon,* and reiterated in federal and state case law, that the public interest is served by allowing a chief executive officer of a state or the federal government to receive information, advice, and recommendations unhampered by the possibility of compelled disclosure of every utterance made, and every piece of paper circulating, in the governor's office."

{¶ 115} It may be an unassailable premise that every utterance or paper scrap from the governor's office should not be made public, but that is a premise wholly irrelevant to this case. Senator Dann is not asking for every utterance or paper scrap. Thus, we do not need to create from whole cloth an overarching, all-powerful executive privilege to achieve a modicum of executive privacy.

{¶ 116} The statements in *Nixon* regarding the importance of candor in presidential decisionmaking make more sense within the context of that case. There, recorded *conversations* were at issue. If conversations were fair game for public disclosure, people interacting with the governor might indeed feel checked in their speech for fear of saying something inappropriate. Here, we are dealing with documents—reflective, written communications from the governor's staff and the heads of state agencies. Is it "unassailable" that seasoned public officials cannot be candid with each other in conducting the public's business if their written communications might be revealed to the public? What is more likely is that public officials would be a little more reflective, careful, and thoughtful before circulating a letter or e-mail. It also means that they would be careful not to suggest what otherwise would be foolish, unwise, or politically motivated decisions, or decisions that violate statutes or regulations.

{¶ 117} The majority exempts the governor from one of this state's clearest guiding principles, open government, on the basis of vague conclusions about human behavior. Can we really know whether the quality of gubernatorial advice would suffer without the creation of a brand new privilege? Could it be that a governor might be more inclined to take good advice if he knows that the public will one day see that he was offered it?

{¶ 118} Certainly, reasonable minds could differ on the question. The point is that we need not answer it. Instead of speculating, we should simply read the Public Records Act. We must not turn our backs on our Constitution, laws, and history based on conclusory assumptions about the way people might behave.

{¶ 119} However, if this court must travel down the road of speculation, we should face the practical implications of the privilege. With the gubernatorial-communications privilege as defined by this court, every memorandum in the executive branch will read, "To: The Governor," whether it is intended for the governor's eyes or not. Just adding the governor's name to a document will cloak it in secrecy. True, this court does enunciate a test for determining

whether the privilege applies to specific documents. But anyone who requests a document under the Public Records Act can now be forced by the governor to pursue a difficult legal battle to retrieve it. The act is designed to make it easy for citizens to learn about their government. The majority has made it easy for the governor to thwart that intent.

{¶ 120} Through its requirement of a "particularized need" on behalf of the requester, this court has essentially slammed the door on open government as it pertains to the governor. In this case, since Senator Dann is not seeking records on behalf of a committee of the General Assembly, he will be found wanting in regard to a particularized need. The same would be true for any other of Ohio's 11 million citizens seeking such information. More astounding is the requirement that state and federal prosecutors, law-enforcement agents, the inspector general, and even committees of the General Assembly would be required to file a complaint for a writ of mandamus and persuade a court that they have a particularized need before being able to review documents when the governor asserts the privilege.

{¶ 121} Finally, in addition to shielding the governor from the operation of our Constitution, statutes, and long-established common law, the majority today exempts the governor from this court's Rules of Civil Procedure. Without the ability to ask any executive branch functionary any question pertaining to documents, the particularized need becomes even more difficult to prove.

{¶ 122} With documents under guard by the governor, many things will remain secret that are the public's business. The public will have to rely on leaks, or even illegally disclosed information, to have an understanding of what government is really up to. We are never well served if Ohio citizens must rely on leaks and off-the-record comments from unknown sources to disclose the important activities of government that affect our lives. Continuing to require that all records be public far better serves our interests. We need not rely on political spin—the documents are what they are, and they speak for themselves.

{¶ 123} The majority writes that "[t]he gubernatorial-communications privilege protects the public by allowing the state's chief executive the freedom that is required to make decisions." The idea that the governor seeks this privilege and that the majority undertakes this judicial grant for the good of the public is inconceivable. This public records request relates to a serious state government scandal, and the factors that brought about the scandal—secrecy, unaccountability, and inside dealing—are the "privileged" matters that this court would shield from public view.

{¶ 124} This whole imbroglio arises from cynicism about government. What we have here is a small group of people using government and its resources to enrich themselves or their friends. It started when one person on the fringes of

state government, with the help of friends inside government, maneuvered a pot of money in the workers' compensation system to a position of low-hanging fruit. The workers' compensation system is a grand and noble idea, based in our Constitution, to compensate people hurt in the workplace. The people involved in this scandal took that grand idea and made it small, using the fund as a 50–million–dollar hog trough.

{¶ 125} Now the governor, like Nixon, parlays the philosophical power of his office into a shameless attempt to shield himself from scrutiny. Ultimately, whatever financial impact this scandal has on the accounts at the Bureau of Workers' Compensation will be absorbed. But today, the majority has crafted a lingering monument to bad government. For the first time in our history, Ohio governors will be free to operate in the dark.

Gittes & Schulte, Frederick M. Gittes, and Kathaleen B. Schulte, for relator.

Jim Petro, Attorney General; and Porter, Wright, Morris & Arthur, Kathleen M. Trafford, Bryan R. Faller, and Anne M. Hughes, for respondent.

Jeffrey M. Gamso and Carrie L. Davis, in support of relator for amicus curiae American Civil Liberties Union of Ohio Foundation, Inc.

Scott A. Pullins, in support of relator for amicus curiae Ohio Taxpayers Association.